Sadie E. COLE et al.

v.

**Patricia Roberts HARRIS, Individually and in her official capacity as Secretary of the United States Department of Housing and Urban Development, et al., Appellants.**

Sadie E. COLE et al., Appellants,

v.

**Patricia Roberts HARRIS, Individually and in her official capacity as Secretary of the United States Department of Housing and Urban Development, et al.**

Nos. 75–2268 and 75–2269.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 11, 1977.

Decided Nov. 14, 1977.

See also 571 F.2d 613.

Charles E. Biblowit, Atty., Dept. of Justice, Washington, D. C., with whom Peter R. Taft, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., Nathan Dodell, Asst. U. S. Atty., and Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., were on the brief for appellants in No. 75–2268 and appellees in No. 75–2269. Robert N. Ford, John A. Terry and Robert M. Werdig, Jr., Asst. U. S. Attys., Washington, D. C., also entered appearances for appellants in No. 75–2268 and appellees in No. 75–2269.

Florence Wagman Roisman, Washington, D. C., with whom Lynn Edward Cunningham, Washington, D. C., was on the brief, for appellants in No. 75–2269 and appellees in No. 75–2268. Ann K. Macrory, Washington, D. C., also entered an appearance for appellants in No. 75–2269 and appellees in No. 75–2268.

Before BAZELON, Chief Judge, and McGOWAN and WILKEY, Circuit Judges.

Opinion for the Court filed by BAZELON, Chief Judge.

Dissenting opinion filed by WILKEY, Circuit Judge.

BAZELON, Chief Judge:

The central issue on appeal is whether appellees, former tenants of the Sky Tower apartments in Southeast Washington, D.C., qualify for relocation assistance under the Uniform Relocation Assistance and Real Property Acquisition Policies Act.[1] A subsidiary issue is whether, if they qualify, they should receive the full benefits of the Act or only some prorated portion of them. We hold that they qualify for full benefits under the statute.

## I. STATEMENT OF THE CASE

Sky Tower was built in the 1950s under a program which provided Federal Housing Administration (FHA) insurance for veterans. It consisted of 19 buildings of garden-type apartments containing 217 one- and two-bedroom units. In 1970, a non-profit corporation purchased Sky Tower and secured a mortgage insured by the Department of Housing and Urban Development (HUD) under Section 236 of the National Housing Act.[2] The corporation undertook to rehabilitate Sky Tower and transform it into a 150-unit complex of larger apartments to serve low and moderate income families. HUD subsidized the interest rate on the mortgage[3] and undertook to pay rent supplements for up to 60 households. In addition, 20 units were to be leased to the National Capital Housing Authority which would re-lease them at public housing rents to eligible households.[4]

By November, 1972, the original and a second general contractor had both defaulted in their performance of the rehabilitation work. The mortgagee then foreclosed on the mortgage and conveyed title to the project to HUD in exchange for mortgage insurance benefits as authorized by statute.[5] At that time, 8 buildings had been completely rehabilitated, 3 were approximately half rehabilitated, and work had not yet begun on 8 others.

HUD took title to Sky Tower on June 15, 1973, and hired a management firm to operate the project. New month-to-month leases were executed with the tenants under the same terms as formerly. But by September, 1974 the agency had concluded that further rehabilitation was futile; it decided to demolish Sky Tower and sell the vacant land to developers for the construction of single family homes for middle-income families. On September 27, 1974, HUD's property manager sent notices to the 72 families then residing at Sky Tower informing them of HUD's decision and giving them 30 days notice to vacate the premises.[6] Nine of Sky Tower's 19 buildings were demolished in December, 1974, and January, 1975. Departing tenants who were not in arrears in their rent were given $300 for moving expenses and exempted from paying their last month's rent. HUD also claims to have assisted them in finding suitable new homes, but that is vigorously disputed by the tenants.[7]

On December 23, 1974, appellees brought suit on behalf of the tenants who had left Sky Towers pursuant to the eviction notices and the few tenants who remained there. They challenged HUD's decision to raze rather than rehabilitate the complex on several grounds and they sought declaratory and injunctive relief, as well as damages. One of their claims was that HUD had failed to comply with the Uniform Relocation Act.

On January 28, 1975, the District Court issued a temporary restraining order against any further demolition. On February 7, the TRO was expanded into a preliminary injunction. Severely castigating HUD for reaching an irrational decision

---

1. 42 U.S.C. § 4601 et seq. (1970) (hereinafter referred to as the Uniform Relocation Act).

2. 12 U.S.C. § 1715z–1 (1970).

3. Pursuant to § 236, 12 U.S.C. § 1715z–1 (1970).

4. Pursuant to 42 U.S.C. § 1401 et seq. (1970).

5. 12 U.S.C. §§ 1713(g) and (k) (1970).

6. The deadline was later extended to January 31, 1975.

7. See, e. g., JA 19, 21, 24, 26, 27, 32, 34, 37, 40, 64.

and failing "to weigh the human values it was created by Congress to protect,"[8] the trial judge enjoined any further demolition or evictions and ordered HUD to (1) clean up the rubble around the site; (2) restore the undemolished buildings to a condition at least as decent, safe, and sanitary as that existing as of September 17, 1974; (3) permit all former tenants who had left Sky Tower subsequent to September 17, 1974, to return to the restored buildings at HUD's expense; and (4) provide security services adequate to prevent vandalism.[9] The trial judge noted that these affirmative directives were necessary because "[o]nly by filling the buildings with qualified needy tenants can the project remain viable pending final determination;" otherwise "vandalism, empty apartments and continuing unsafe conditions would, as a practical matter, effectively accomplish demolition by a process of erosion."[10]

HUD appealed from the portions of the preliminary injunction requiring it to restore the buildings and arrange for the return of the tenants. But both the District Court and this court refused to stay the order pending appeal, and, after HUD had complied with its terms, the appeal was dismissed as moot.[11]

But compliance was slow in coming. The trial judge repeatedly noted HUD's "continuing definance" of the order and took numerous steps to compel obedience, including finally an order to show cause why the government should not be held in contempt.[12] Six months passed before any tenant was returned to Sky Tower.

As of February, 1975, 17 households were still living at Sky Tower and 55 households had moved out. Most of those who had been displaced had relocated in units that were more expensive, smaller, or otherwise less desirable than the units they had left at Sky Tower. When HUD determined to evict the tenants from Sky Tower, it thrust them into a housing market that could not accommodate them. Instead, it was the acute shortage of housing in the District of Columbia for low-income persons with large families—the very class Sky Tower served—that made the decision to demolish so shocking to the trial judge.

The record shows that tenants experienced considerable difficulty in securing replacement housing.[13] One tenant's rent increased from $84 to $189.50—out of a total income of $243 per month for herself and two children. Another had to spend $185 for rent out of a total monthly income of $207—compared to $98 for rent at Sky Tower.[14]

The practical effect of the preliminary injunction on these tenants was notification in July, 1975, that they could return to Sky Tower. HUD would pay their moving expenses and any expenses incurred in breaking their new leases. But the letter also stated:

> The future of Sky Tower Apartments is not yet known. As a result of the Court case, HUD is taking a new look at the question of demolition of Sky Tower. If HUD should still decide to demolish, that decision would be reviewed by the Court. While it is possible that Sky Tower will ultimately be demolished, it is also possible that it will not. In the meantime, the Court's order requiring HUD to rehabilitate the units and move tenants back into the restored units will remain in effect.[15]

Faced with this uncertainty and the very real possibility of being uprooted yet again, only 18 families decided to return to Sky Tower.

---

8. *Cole v. Lynn*, 389 F.Supp. 99, 105 (D.D.C. 1975).

9. *Id.* at 106.

10. *Id.* at 105.

11. *Cole v. Lynn*, No. 75–1543 (D.C. Cir., dismissed Sept. 29, 1975).

12. JA 79. *See also Cole v. Hills*, 396 F.Supp. 1235 (D.D.C.1975).

13. *See* note 7 *supra.*

14. JA 64 and 29.

15. Joint letter sent to all former tenants of Sky Tower, July 16, 1975.

On September 12, 1975, the District Court granted partial summary judgment for the tenants, holding that the tenants who had vacated Sky Tower were entitled to benefits under the Uniform Relocation Act. Specifically, the court entered a declaratory order that any person who was a tenant of Sky Tower on September 27, 1974, and who had vacated his or her apartment as a result of HUD's notice, was entitled to a prorated portion of the benefits provided under Section 204 of the Act [16] for the period between the date that tenant left Sky Tower and the date the tenants were permitted to return pursuant to the court's preliminary injunction (i. e., August 1, 1975). The government took this appeal from the holding that the Uniform Relocation Act applies. The tenants cross-appeal from the termination of benefits on August 1.[17]

## II. APPLICABILITY OF THE UNIFORM RELOCATION ACT

The Uniform Relocation Act was passed in 1970 to establish a uniform policy for the fair and equitable treatment of all persons displaced as a result of any federal or federally assisted program.[18] It replaced a patchwork of piecemeal relocation statutes. For displaced tenants, it provides the following benefits: (1) actual reasonable moving expenses, or a moving expense allowance of up to $300 and a dislocation allowance of $200,[19] and (2) a payment of the amount necessary to rent a comparable decent, safe, and sanitary dwelling for up to four years, but not to exceed $4,000.[20] Most importantly, the Act provides that:

> No person shall be required to move from his dwelling on or after January 2, 1971, on account of any Federal project, unless the Federal agency head is satisfied that replacement housing, in accordance with section 4625(c)(3) of this title, is available to such person.[21]

Section 4625(c)(3) specifies that such replacement housing must be "in areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the families and individuals displaced, . . . and reasonably accessible to their places of employment . . . ."

To qualify for benefits under the Act, a tenant must come within the statutory definition of "displaced person." Reduced to its essential language, that definition reads:

> The term "displaced person" means any person who . . . moves from real property . . . as a result of the acquisition of such real property, . . . or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency . . . .[22]

---

16. 42 U.S.C. § 4624 (1970).

17. Subsequently, the District Court, with the consent of the parties, remanded the question of the disposition of Sky Tower to HUD for reconsideration in light of the concerns expressed in the court's opinion on the preliminary injunction. On December 17, 1976, HUD reported to the court that it had decided not to demolish the buildings but rather to transfer them to the District of Columbia, with HUD continuing to contribute substantial rent subsidies.

18. 42 U.S.C. § 4621 (1970).

19. 42 U.S.C. § 4622(a)(1) and 4622(b) (1970).

20. 42 U.S.C. § 4624(1) (1970). The payment is equal to the difference between the displaced person's former rent and the rent for a comparable replacement dwelling. 24 C.F.R. § 42.-95(c) (1977). The Act also offers, as an alternative not relevant here, up to $4000 towards a downpayment on the purchase of a dwelling. 42 U.S.C. § 4624(2) (1970).

21. 42 U.S.C. § 4626(b) (1970).

22. 42 U.S.C. § 4601(6) (1970). Section 4601(6) reads in full:

> The term "displaced person" means any person who, on or after January 2, 1971, moves from real property, or moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency, or with Federal financial assistance; and solely for the purposes of sections 4622(a) and (b) and 4625 of this title, as a result of the acquisition of or as the result of the written order of the acquiring agency to vacate other real property, on which such person conducts a business

The section sets out two alternative grounds of eligibility: having moved as a result of the acquisition of property for a federal program or project (the acquisition clause); *or* having moved as a result of a written order of the acquiring agency to vacate the property for a federal program or project (the notice clause). The District Court ruled that appellees clearly fell within the second or notice definition:

[B]y having come into possession of the Sky Tower Apartment project as the result of a mortgage default, HUD was "the acquiring agency" within the meaning of the Act;

. . . the notices of September 27, 1974 advising Sky Tower tenants to vacate were the "written order of the acquiring agency to vacate real property" within the meaning of the Act; and

. . . the notices aforesaid were "for a program or project undertaken by a federal agency" within the meaning of the Act, to wit, the demolition of Sky Tower . . . [23]

■ We agree that appellees qualify as "displaced persons" under the notice alternative. It is undisputed that HUD is an "agency," and that HUD "acquired" Sky Tower within the common meaning of that word. It is undisputed that HUD, having acquired Sky Tower, served upon each tenant a written order to vacate.[24] And it is undisputed that some 55 households moved from Sky Tower "as the result of" HUD's written order.

■ Moreover, it is clear that the Sky Tower tenants were ordered to vacate their apartments "for a program or project undertaken by a Federal agency," namely, the demolition of the buildings. Although there is some suggestion in the government's brief that a "program or project" means only "a federal construction or rehabilitation project, such as public works or

urban renewal,"[25] there is no warrant in the statute for this limiting interpretation. Obviously, construction and rehabilitation projects will frequently be preceded by demolition. If the government means that demolition is a "project" within the Act when the agency constructs a building in its place but not when the agency simply tears down without building up, the anomaly is obvious. HUD's mandate is to increase the stock of decent, sanitary housing for low-income families—not to destroy existing housing. Congress clearly did not intend that tenants displaced by a simple decision to wreck their homes would receive less protection than tenants displaced by a constructive urban renewal project.

In sum, appellees qualify as "displaced persons" within the plain terms of the notice clause. This common sense interpretation is reinforced by consideration of the policies of the Relocation Act. A basic purpose of the Act is to ensure that displaced persons do not "suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole."[26] Equally important, by providing relocation benefits for persons displaced by programs or projects for the general welfare, the Act ensures that federal officials take the costs of relocation into account *before* embarking on such programs.

Clearly, the Sky Tower tenants were displaced for a federal project "designed for the benefit of the public as a whole." In proceedings before the district court, HUD admitted that the demolition of Sky Tower was part of a program to "eliminate blight." It stated that Sky Tower had become "blighted, vandalized, unattractive and unsafe" and that the area needed to be "revitalized" by the construction of single-family dwellings in accordance with the District of Columbia government's master

or farm operation, for such program or project.

**23.** JA 89.

**24.** Letter sent to all tenants of Sky Tower, Sept. 27, 1974.

**25.** Government brief at 15.

**26.** 42 U.S.C. § 4621 (1970).

plan.[27] Thus, unless relocation benefits are paid to the former Sky Tower residents, they will be forced to bear a disproportionate share of the costs of a project for the benefit of the general public, and federal officials will be able to ignore relocation costs in considering whether to proceed with the project.

Although the Sky Tower tenants appear to qualify for benefits under the plain terms of the notice definition, the government nevertheless maintains that this definition is subject to a restriction not apparent from the face of the statute. Specifically, it contends that the tenants do not qualify as "displaced persons" because, at the time Sky Tower was *acquired*, HUD had not determined to use it for a federal program or project. We find the arguments advanced in support of this implied restriction unpersuasive.

First, the government argues that this restriction is required by *Caramico v. Secretary of Dept. of Housing and Urban Development*, 509 F.2d 694 (2d Cir. 1974), which held that "random and involuntary" acquisitions of property due to default and foreclosure are not *acquisitions* for a federal program or project.[28] As the government concedes, *Caramico* was concerned solely with the acquisition definition, rather than the one upon which the Sky Tower tenants rely, the notice definition.[29] But it finds significance in the phrase "acquiring agency" contained in the notice definition. Invoking the principle that the same word used in different parts of a statute is presumed to have the same meaning each time it is used,[30] it argues that "acquiring agency" should be interpreted to mean an agency making an "acquisition" as that term was construed by *Caramico*. In other words, that the notice definition, like the acquisition definition, should not apply where property is *acquired* due to default and foreclosure and only later is committed to use in a federal program or project.

We find little merit in this argument. Aside from the fact that "acquiring agency" is *not* the same word as "acquisition"— the former is an entity whereas the latter is an event—the government's argument proves too much. If an "acquisition" as that term is used in the acquisition clause is also required under the notice clause, then the notice alternative would be rendered surplusage.

More fundamentally, the government's argument fails to probe beyond the holding of *Caramico* to the rationale of that decision. Because the Relocation Act "contemplates a conscious government decision to dislocate some so that an entire area may benefit," 509 F.2d 698, *Caramico* requires that an "acquisition" for purposes of the acquisition clause must be *for* a federal program or project. By parity of reasoning, the Act requires that an "order to

---

**27.** Government memorandum, *quoted* 396 F.Supp. at 1236. This purpose distinguishes the instant case from *Alexander v. U. S. Dept. of Housing and Urban Development*, 555 F.2d 166 (7th Cir. 1977). There the decision to terminate, but not demolish, a housing project was held not to be a federal program or project. HUD had made no plans for the future of the buildings. The court said,

> We fail to see how a decision to terminate a project can itself become a project *in the absence of some indication that the decision to terminate and the order to vacate constitute a prelude to some governmental undertaking amounting to a program designed for the benefit of the public as a whole.*

*Id.* at 170. (emphasis added)

**28.** Because we conclude that appellees qualify as "displaced persons" under the notice clause, we need not reach the difficult question whether they also qualify under the acquisition clause. Thus, although we agree with *Caramico* that the acquisition clause requires an acquisition *for* a federal program or project, 509 F.2d at 697, we express no opinion as to whether HUD's *acquisition* of Sky Tower, or any similar acquisition, can be so described.

**29.** *Harris v. Lynn*, 411 F.Supp. 692 (E.D.Mo. 1976), aff'd, 555 F.2d 1357, 1359 (8th Cir. 1977), relied upon by the dissent, also appears only to construe the acquisition clause of the Relocation Act. To the extent that that case can be interpreted as requiring an acquisition for a federal program or project under the *notice clause*, we disagree.

**30.** *Citing Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87, 55 S.Ct. 50, 79 L.Ed. 211 (1934).

vacate" in terms of the notice clause must be *for* a federal program or project, a requirement satisfied in this case. The government's argument that the notice clause requires, *in addition*, that an agency *acquire* property for a government program or project, would artificially restrict the coverage of the Act in a way inconsistent with the policies recognized by *Caramico.*

■ The government's second argument, vigorously pursued by the dissent, is that the legislative history of the Relocation Act indicates the notice definition was intended to apply when an agency issues an order to vacate *before* real property is acquired. Of course, resort may be had to legislative history when a statute is ambiguous, or

31. *See, e. g., United States v. Public Utilities Comm.,* 345 U.S. 295, 315, 73 S.Ct. 706, 97 L.Ed. 1020 (1953); *United States v. Missouri Pac. R. Co.,* 278 U.S. 269, 278, 49 S.Ct. 133, 73 L.Ed. 322 (1929).

32. The dissent emphasizes the fact that the original Senate bill defined a "displaced person" as one who moves "as a result of the acquisition or reasonable expectation of acquisition." 115 Cong. Rec. 31372 (1969). The dissent concludes that in adopting the House bill, which deleted the reference to "reasonable expectation of acquisition " and added the notice clause, Congress intended only "to provide a more concrete standard than 'reasonable expectation' of acquisition." Dis. op. at —— of 187 U.S.App.D.C., at 609 of 571 F.2d. However, there is little evidence in the legislative history that sheds light on Congress' intent in enacting the House version, and what evidence exists is ambiguous.

The House Report contains only one sentence directly applicable to the notice clause. This says: "If a person moves as the result of such notice to vacate, it makes no difference whether or not the real property actually is acquired." H.R.Rep.No.1656, 91st Cong., 2d Sess. (1970), *reprinted in* [1970] U.S.Code Cong. & Admin.News pp. 5850, 5853. This implies that *one* circumstance in which the notice clause applies is when an agency orders someone to vacate property before the agency acquires it. But the Report does not say that this is the *only* situation in which the notice clause applies. In fact, the conditional language of the quoted sentence implies just the opposite.

The dissent also relies on a statement in an executive branch memorandum stating that the Senate version was "broader" than the House version. Dis. op. at —— of 187 U.S.App.D.C., at 608 of 571 F.2d, quoting 116 Cong.Rec.

where the ordinary meaning would lead to absurd or futile results.[31] But "the plainer the language, the more convincing contrary legislative history must be." *United States v. United States Steel Corp.,* 482 F.2d 439, 444 (7th Cir.), *cert. denied,* 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147 (1973). Since the notice clause is clear on its face, and its common sense meaning is consonant with the purposes of the Act, we would accept the government's interpretation of the clause only if supported by clear and convincing evidence from the legislative history.

In fact, there is very little legislative history expressly concerned with the meaning of the notice clause and the history that exists is, at best, inconclusive.[32] The mea-

42139 (1970). This too is inconclusive. The "reasonable expectation of acquisition" language in the Senate bill would indeed cover some situations not covered by the notice definition, *i. e.,* where the government has not acquired property and has not sent notice but there is a reasonable expectation of acquisition. But it does not necessarily follow that Congress, as opposed to the executive, intended the notice definition to be narrower than the Senate definition *in all respects.*

We are equally unpersuaded by the dissent's citation to other sections of the Relocation Act referring to persons displaced because of "acquisitions." Dis. op. at —— of 187 U.S.App. D.C., at 609 of 571 F.2d. This shorthand cross-reference is obviously more convenient than repeating the entire definition. The explanation for the particular choice of words most consistent with the purpose of the Act is that Congress assumed displacements would occur more frequently from acquisitions than from notices to vacate government property.

Similarly misguided is the dissent's reliance on § 217 of the Act, 42 U.S.C. § 4637 (1970). The dissent concludes that there would have been no need to enact § 217 if Congress had intended the notice clause to have its common sense meaning, since persons displaced under the programs referred to in this section "would undoubtedly have been given notices to vacate 'for' these projects and would have been qualified under the notice clause . . .." Dis. op. at —— of 187 U.S.App.D.C., at 612 of 571 F.2d. The basis for this assertion is not apparent. In fact, written notice is not required by either program referred to in § 217. See 42 U.S.C. § 1455(c)(1) (1970) (title I of the Housing Act of 1949); 42 U.S.C. § 3307 (1970) (title I of the Demonstration Cities and Metropolitan Development Act of 1966). Congress could quite reasonably conclude that even under the

ger state of the legislative history suggests that in considering the definition of "displaced person" Congress' attention was focused on the class of persons displaced by acquisitions or anticipated acquisitions of property, rather than the class of persons already living on government property and displaced by a federal program or project. But congressional inattention does not constitute the kind of convincing demonstration of contrary legislative intent required to overcome the plain language of the statute. In fact, considering the purposes of the Relocation Act, we are convinced that if Congress had explicitly considered the problem of persons ordered to vacate government property for a program or project, it would have approved an interpretation of the Act making benefits available for such persons.

The government's final argument is that the plain terms of the Uniform Relocation Act cannot be heeded because to do so would impose a financial burden on HUD. The essential point, however, is that any financial burden results not from our construction of the Act but rather from HUD's own decision to displace people in order to demolish their homes. HUD appears to suggest that if the costs of relocation are too heavy for government funds, the displaced tenants should bear them. But the mandate of the Act is precisely contrary: if the costs are too much for HUD, then the demolition should not take place.[33]

## III. AMOUNT OF BENEFITS AVAILABLE

The District Court ruled that all persons who were tenants of Sky Tower on September 27, 1974, and who vacated their apartments as a result of HUD's notice, were entitled to a prorated portion of the benefits provided under Section 204 of the Act[34] for the period between the date of their move and August 1, 1975 (or the date on which any such person actually returned to Sky Tower, if earlier than August 1, 1975). August 1 was selected as the cut-off date because by that date all former tenants had been given the opportunity to return to Sky Tower pursuant to the preliminary injunction. As we understand the District Court's order, the Act's moving expenses benefit and its requirement that replacement housing be available are *fully* applicable to appellees; however, under the order appellees are entitled to only a *prorated* portion of the Act's rent benefits. As noted *supra*,[35] under the terms of the Act these latter benefits may amount to a maximum of $4000 over a four-year period. Under the District Court's formula, however, these benefits would be limited to approximately $750 per tenant.

■ We believe the trial judge was correct to prorate the benefits to those tenants who actually returned to Sky Tower in the summer of 1975. Their return to their original homes made the provision of money

---

notice definition it was uncertain that persons displaced by these programs would be eligible for benefits. The explanation for § 217 most congruent with the legislative purpose is that it was enacted "out of uncertainty, understandable caution, and a desire to avoid litigation." *National Petroleum Refiners Ass'n v. FTC*, 157 U.S.App.D.C. 83, 107, 482 F.2d 672, 696 (1973), *cert. denied*, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974).

33. "It is no longer proper to require the displaced person, rather than the displacing project, to bear the cost of relocation. If this cost becomes prohibitive and necessitates some re-thinking about a particular project, then so be it, just as if the cost of land or labor and materials were prohibitive." Abramowitz, *Uniform Relocation Act Defended*, 29 Journal of Housing 279, 281 (1972).

It should be noted that, in a situation like the instant one, where there is a shortage of suitable replacement housing, *see* 42 U.S.C. §§ 4626(b) and 4625(c)(3) (1970), the costs of relocation to be borne by HUD might include the expense of constructing replacement housing. Section 4626(a) provides:

If a federal project cannot proceed to actual construction because comparable replacement sale or rental housing is not available, and the head of the Federal agency determines that such housing cannot otherwise be made available he may take such action as is necessary or appropriate to provide such housing by use of funds authorized for such project.

34. 42 U.S.C. § 4624 (1970).

35. See n. 19 *supra* and accompanying text.

towards rent for comparable *replacement* housing unnecessary. Indeed such payments could not have been reconciled with the statute.[36]

We cannot agree, however, that benefits to those tenants who did not choose to return to Sky Towers should terminate on the date they were given leave to return. We can understand the trial judge's disappointment that only 18 of the 55 displaced families chose to return. He felt that the remainder had "walked away from what they brought suit for, and now they want money," not housing.[37] But while this reaction is understandable, it overlooks a critical fact—the court's issuance of a *preliminary* injunction did *not* grant to appellees the right to return to the quiet enjoyment of their homes; rather, it gave them only the limited right to return *pendente lite* to a half demolished and decimated community which might still have been demolished in the near future.[38] A decision to return would mean giving up new homes found only after arduous search, undergoing the disruption of a second move some nine months after the first, and assuming the very substantial risk of being uprooted yet again should the demolition decision be upheld.

The affidavits in the record amply demonstrate that the tenants were motivated by these concerns, not a desire to "walk away" from the lawsuit.[39] Faced with the uncertainty of the situation, it was not unreasonable for some of the families to decline to return. We hold that the offer to return *pendente lite* pursuant to the *preliminary* injunction did *not* cut off the rights of relocation payments of those tenants who did not return.[40]

Accordingly the decision below is

*Affirmed in part and reversed in part.*

WILKEY, Circuit Judge, dissenting:

To read the confident language of Chief Judge Bazelon's opinion one would never guess that three circuits, three districts, twelve federal judges—every federal judge considering the issue before this case—had ruled contrary to the result reached by my colleagues here. They say that "appellees qualify as 'displaced persons' within the plain terms of the notice clause" and that this "common sense interpretation is reinforced by consideration of the policies of the Relocation Act."[1] The Seventh Circuit

---

**36.** 42 U.S.C. § 4624 (1970).

**37.** The following colloquy took place:
> THE COURT: No, I am not talking about the returning tenants. I am talking about the majority of your class that doesn't want to come back—that is the group I am talking about. The great bulk of these people listed in the report don't want to have anything to do with Skytower. They walked away from what they brought suit for, and now they want money, and that is where we are at.
> MRS. ROISMAN: Well—
> THE COURT: And I want to know how that is going to be handled.
> MRS. ROISMAN: Well, to be fair, Your Honor, I do want to say that it is not that they have walked away—
> THE COURT: They certainly have. They certainly have, and it has been a great disappointment after the extraordinary effort the Court made on representations as to their need—they all walked away from it.
> Now I don't want to argue that, but they did.

JA 99.

**38.** This message was made explicit in the letter, approved by counsel for both sides, sent to all

former tenants pursuant to the preliminary injunction. *See* text at note 14 *supra*.

**39.** JA 49, 72, 84.

**40.** HUD's own Handbook on providing replacement housing states: "In no case shall referral be made to a unit from which it can reasonably be anticipated that the family or individual may subsequently be displaced." HUD Relocation Handbook 1371.1 REV. at 2–15 (Feb., 1975). The offer to return to Sky Tower did not satisfy this requirement.

**1.** Maj. op. at —— of 187 U.S.App.D.C., at 595 of 571 F.2d. And cf.:
> Of course, resort may be had to legislative history when a statute is ambiguous, or where the ordinary meaning would lead to absurd or futile results. But "the plainer the language, the more convincing contrary legislative history must be." . . . Since the notice clause is clear on its face, and its common sense meaning is consonant with the purposes of the Act, we would accept the government's interpretation of the clause only if supported by clear and convincing evidence from the legislative history.

in *Alexander v. HUD*[2] held squarely the reverse; *Alexander* involved the notice clause, not the acquisition clause, and cannot fairly be distinguished from our case here. The Eighth Circuit in *Harris v. Lynn*[3] dealt with persons displaced from property already owned by the federal agency, our situation here, and held that the tenants were not "displaced persons" under the Act, even though they may have moved pursuant to a notice to vacate, because absence of a federal "acquisition" was the key. The Second Circuit in *Caramico v. HUD*[4] likewise held contrary in both rationale and result to the decision of my colleagues here, who attempt to distinguish *Caramico* on the ground that it involved the acquisition clause, not the notice clause. That same distinction was argued in *Alexander* and rejected by the Seventh Circuit, which pointed out that the rationale of *Caramico* applies with equal validity whether the acquisition or the notice clause is involved.

These persuasive precedents will be discussed in detail at the proper place later in this dissent. I mention them at the outset to make the reader of Judge Bazelon's well-written opinion aware that it rests, not on firm logic and precedent, but on no precedent and on a rationale which has been argued and universally repudiated elsewhere. Now to the facts of this case, and the proper application of the statute and the precedents thereto.

To be entitled to benefits as a "displaced person" under the Uniform Relocation Assistance and Real Property Acquisition Policies Act[5] a person must be required to move as a *result of the acquisition of property for a program or project* undertaken by a federal agency or with federal financial assistance. Or, alternatively, a "displaced person" may be someone required to move as a *result of a written notice by the acquiring agency to vacate real property for a program or project* undertaken by a federal agency or with federal financial assistance. In this case, the Department of Housing and Urban Development (HUD) acquired title to the Sky Tower buildings due to the default and foreclosure of the mortgage it had insured. About fifteen months later, HUD delivered written orders to the tenants to vacate, so that Sky Tower could be demolished and the land sold to developers.

HUD's position is that the tenants at Sky Tower are not "displaced persons" within the meaning of the Uniform Relocation Assistance and Real Property Acquisition Policies Act (the Uniform Relocation Act or the Act). Relying heavily upon the decisions of the Seventh Circuit in *Alexander v. HUD*,[6] the Eighth Circuit in *Harris v. Lynn*,[7] and the Second Circuit in *Caramico v. HUD*,[8] HUD argues that the definition of a "program or project undertaken by a Federal agency" must be limited to "consciously and voluntarily undertaken public works projects." HUD contends that in this case the acquisition due to a default and foreclosure of an insured mortgage was random and involuntary and, therefore, should not be covered by the Uniform Relocation Act. Also, the acquisition was not for any "program or project" which HUD had in mind.

Accepting neither the soundness of the *Caramico* definition of "program or project," accepted by the Seventh and Eighth Circuits, nor the HUD characterization of the acquisition here as involuntary, the majority holds that appellees here, the Sky Tower tenants, are "displaced persons." The majority tries to avoid taking issue directly with the holding of *Caramico*, however, and rests its decision upon the

*Id.* at ——, at 597 of 571 F.2d (footnote and citation omitted).

2. 555 F.2d 166 (7th Cir. 1977), *rehearing denied*, 19 September 1977.

3. 555 F.2d 1357 (8th Cir. 1977), *affirming* 411 F.Supp. 692 (E.D.Mo.1976).

4. 509 F.2d 694 (2d Cir. 1974).

5. 42 U.S.C. § 4601(6) (1970).

6. Note 2 *supra*.

7. Note 3 *supra*.

8. Note 4 *supra*.

grounds adopted by the District Court, that the tenants were required to move by the HUD notices to vacate for a federal project, namely the demolition of Sky Tower. I cannot join in this conclusion. (As I shall explain in more detail later, the "notice" category of "displaced persons" was designed by Congress to include persons *who move prior to acquisition* upon receiving notice from the acquiring agency of its intention to acquire the property. Even if the agency does not acquire the property for some reason, these persons would be assured of benefits under the Uniform Relocation Act. The "notice" alternative was *not* meant to apply to a situation such as this where HUD had already acquired Sky Tower and a year later gave notices to vacate.)

As will be seen in the analysis which follows, the critical inquiry must consider the first clause of the "displaced person" definition, namely, whether the initial "acquisition" of Sky Tower was for "a program or project undertaken by a Federal agency," as well as the second ("notice") clause of the definition, for both clauses contemplate a *voluntary* acquisition, and both an *actual* acquisition and a notice of a *proposed* acquisition must be "for a program or project" and anticipated resulting displacement. As will be seen below, the acquisition here, by default and foreclosure of an insured mortgage, should be considered involuntary. Further, as *Caramico* properly establishes, acquisitions by such involuntary and random means are not for a federal "program or project" within the meaning of the Uniform Relocation Act.

In short, falling into neither clause of the definition, appellees here are not "displaced persons." This result rests, I believe, upon a reading of the statutory definition which is faithful to Congressional intent, consistent with the text of the definition and the structure of the statute, and supported by case law. Whether this result, which disqualifies appellees from the benefits of the Uniform Relocation Act, is justified by reasons of policy or equity remains a question for Congress, and not for the courts, as is made clear in Part IV below.

## I. INVOLUNTARY ACQUISITION—THE FACT HERE

As the majority explains in more detail,[9] Sky Tower was purchased in 1970 by a nonprofit corporation by means of a mortgage insured by HUD. Following abandonments by the contractors and default by the nonprofit corporation, the mortgagee elected to foreclose on the mortgage and transfer title to HUD in return for the mortgage insurance benefits. In the language of *Caramico*,[10] this acquisition was "involuntary and in response to the default." Such "random acquisitions . . . of defaulted property," *Caramico* continued, "are not acquisitions 'for a program or project undertaken by a Federal agency' within the contemplation of the drafters of the Relocation Act."

While the majority avoids responding to *Caramico* directly,[11] the question of whether HUD's act here was an acquisition "*for* a [federal] program or project," *i. e.*, a voluntary acquisition, must ultimately be faced under the notice clause discussed later. Hence it is helpful to look at what the District Court said relevant to this point:

Rehabilitation work began at Sky Tower in May of 1971. By November, 1972, two contractors had defaulted in their performance of the rehabilitation work. At that time, eight buildings had been completely rehabilitated, three were approximately 50 percent rehabilitated, and work had not yet begun on eight others. Although the non-profit sponsor wished to complete the rehabilitation work, and the mortgagee was prepared to allow that, HUD insisted that the property be foreclosed. *See* 24 C.F.R. § 236.56. Title

---

9. Maj. op. at —— of 187 U.S.App.D.C., at 592 of 571 F.2d.

10. 509 F.2d at 699 (footnote omitted).

11. *See* Maj. op. at —— n. 28 of 187 U.S.App. D.C., at 596 of 571 F.2d.

was transferred to HUD on June 15, 1973.[12]

Note that the District Court only says that HUD "insisted" upon foreclosure. The obvious question is *why* HUD "insisted." Could it have been that HUD had no option but to insist upon foreclosure, thus making its action involuntary? The answer is yes, and the clue is the citation.

That citation provides the explanation for HUD's "insistence." 24 C.F.R. § 236.56, "Determination of project feasibility—fair market rentals," as set out in full below, establishes the rule in its paragraph (a) that HUD *shall not* make commitments for mortgage insurance for projects where the rents will exceed the rents for similar housing.[13] Paragraph (b) of the rule, as noted below, sets out the two *necessary* conditions

for any exceptions to the limit. With its bare citation to § 236.56, the District Court's opinion does not explain HUD's "insistence," but, as the rule itself suggests, it may well have been that HUD had no option but to insist.

Reference to the record, moreover, indicates that HUD's acquisition was indeed involuntary. An understanding of further background events, some of which were not described by the District Court, may be helpful in making a fair characterization. As noted by the District Court, rehabilitation work began in May of 1971. According to the Acting Director of the HUD District of Columbia Area Office, whose affidavit in relevant part below describes the chronology of events,[14] in March of 1972 the non-

---

**12.** *Cole v. Lynn*, 389 F.Supp. 99, 101 (D.D.C. 1975).

**13.** § 236.56 Determination of project feasibility—fair market rentals.

(a) In the determination of project feasibility prior to issuing a commitment for mortgage insurance under this part, the fair market rentals estimated in accordance with § 236.56(a)(2) shall be at a level that can be expected to attract nonsubsidized tenants, who will pay fair market rentals, and shall not exceed the rentals obtainable for reasonably comparable nonsubsidized rental dwelling units similarly located. Adjustments may be made in such rentals to reflect additional management services such as increased tenant screening, counseling, and income certification and recertifications.

(b) In determining the feasibility of a project to be located in a deteriorating residential neighborhood, the Commissioner may determine a project to be feasible with estimated fair market rental levels in excess of those than [*sic*] can be expected to attract nonsubsidized tenants in that neighborhood provided that:

(1) The estimated fair market rentals do not exceed estimated fair market rentals obtainable in comparable projects in more stable neighborhoods, and

(2) The proposed project can be expected to contribute to the stabilization or improvement of the neighborhood.

[37 F.R. 7157, Apr. 11, 1972]

**14.** AFFIDAVIT OF HARRY W. STALLER

HARRY W. STALLER, first being duly sworn, deposes and says:

1. This affidavit is submitted for purposes of explaining the circumstances under which HUD acquired title to the Sky Tower project

and other facts relevant to the relocation of Sky Tower tenants. Although I did not become Acting Director of the HUD D.C. Area Office until July 1973 the statements contained herein are based upon reports from members of my staff and documents contained in the project files, as well as my personal knowledge.

2. The sponsor of the Sky Tower project, Anacostia No. One, Inc., experienced difficulty with the original general contractor and through the mortgagee for the project Walker and Dunlop, Inc., requested in March 1972 that HUD approve a substitution of contractors and an increase in the maximum amount of the mortgage from approximately $2.9 million to $3.2 million. An interim increase in the insured mortgage is an unusual action which increases HUD's liability. In fact, it is my understanding that an interim increase had never been granted in this office prior to that time. However, because of HUD's desire to have the project completed, the requests were approved by June 1972.

3. The second contractor abandoned work on the project in November 1972. HUD allowed the sponsor to attempt to finish the project by itself. However, in January 1973, the second contractor filed a law suit against the sponsor and mortgagee and, in addition, placed a lien on the property on February 22, 1973, in violation of the terms of the construction contract.

4. Since the owner was unable to bond off the mechanics lien, no further mortgage proceeds could be drawn to fund interest and construction costs. In March 1973, Walker and Dunlop, Inc., the mortgagee for the project, notified the Area Office of the default citing as a basis the fact that the contractor had quit the project, a lien had been placed on the project,

profit sponsor asked HUD to approve a substitution of contractors and to increase the insured mortgage from $2.9 million to $3.2 million. HUD agreed to this "unusual action" of increasing its liability. After the second contractor abandoned work on the project and placed a lien on the property, the *nonprofit sponsor was thrown into default*. At this point, in April of 1973 HUD was informed that *the mortgagee had elected to foreclose*, as it was permitted to do by HUD regulations. The sponsor then sought a *second* increase from HUD in the amount of the insured mortgage, which was presumably *the mortgagee's condition for allowing the sponsor to complete the work*. By HUD's account, however, "[b]ecause of the past history of the project and since this increase would require rents in excess of what tenants in the neighborhood could afford or would be willing to pay, HUD had no alternative but to reject this request." [15] *HUD's inability to extend a second insurance increase was presumably based on 24 C.F.R. § 236.56*, which, as noted, directs that mortgage insurance shall not be committed where the rents would be in excess of rents for similar housing.[16]

In sum, then, it appears from the record—and is consistent with the opinion of the District Court—that HUD's taking of title to Sky Tower was an involuntary acquisition in response to a default. Whether such acquisitions are for a "program or project" within the meaning of the Uniform Relocation Act is the issue to which I now turn.

## II. "PROGRAM OR PROJECT"—VOLUNTARY AND INVOLUNTARY ACQUISITION

In *Caramico v. HUD, supra*, residents of housing units in low income areas were evicted by mortgagees seeking to recover on their mortgage insurance following default. Under FHA regulations, recovery required that the mortgagee tender possession of the property unoccupied to FHA, although FHA could waive the requirement in particular cases. Although FHA had acquired the properties in *Caramico*, thus compelling the residents to move prior to the acquisition, the Second Circuit did not consider the acquisition as being "for a program or project undertaken by a Federal agency, or with Federal financial assistance." Drawing upon the legislative history as well as other provisions of the Uniform Relocation Act, *Caramico* read the "program" definition as "contemplat[ing] normal government acquisitions, which are the result of conscious decisions to build a highway here or a housing project or hospi-

and, interest due February 1 had not been paid. A copy of the notice of default is attached hereto, as Exhibit I and incorporated herein.

5. Under HUD Regulations, when a project is in default, the mortgagee has the option of either foreclosing the mortgage or assigning it to HUD. By letter dated April 4, 1973, Walker and Dunlop informed the Area Office that it had elected under the terms of the contract for mortgage insurance to foreclose on the property. A copy of this letter is attached hereto as Exhibit II and is incorporated herein.

6. In the following weeks the sponsor of the project requested another increase in the maximum amount of the insured mortgage. Because of the past history of the project and since this increase would require rents in excess of what tenants in the neighborhood could afford or would be willing to pay, HUD had no alternative but to reject this request.

7. By letter dated May 7, 1973, Walker and Dunlop notified the HUD Central Office of its intention to foreclose on the mortgage at the earliest possible date. A copy of this letter is

attached hereto as Exhibit III and is incorporated herein.

8. HUD accepted title to and possession of the property on June 15, 1975, [*sic*], and subsequently paid Walker and Dunlop mortgage insurance benefits approximately in the amount of proceeds disbursed under the mortgage during construction.

15. *Id.* at paragraph 6.

16. *See* 24 C.F.R. § 236.56(a), *quoted in* note 13 *supra*. Paragraph (b), as noted, sets out the two necessary conditions for any exception. Although the record is not conclusive on this point, it does not appear that HUD considered Sky Tower as a project suitable for exceptional treatment. By the reference in the affidavit to the project's "past history," HUD was taking note, doubtlessly, of the one increase already granted, the two abandonments by contractors, the lien placed on the property, and the original election of the mortgagee to foreclose.

tal there."[17] Acquisitions due to defaults and foreclosures, being involuntary and random, were not judged by *Caramico* as being for "a program or project."

Relying on *Caramico*, HUD argues that this acquisition likewise, being involuntary, is not for a "program or project."

In formulating its definition, *Caramico* drew upon *four* separate provisions of the Uniform Relocation Act: 42 U.S.C. §§ 4621, 4626, 4625(a) and 4651(1) & (8).[18] In addition, *Caramico* took account of the legislative history, quoting extensively from the House Report.

The *Caramico* definition is thus soundly based upon the various provisions of the statute and the intent of Congress. The examples in the House Report of typical acquisitions—for a highway or for a hospital—involve, as *Caramico* explained, conscious and planned government decisions to proceed with particular projects. In making these decisions, the Government can and must calculate in the cost of relocation. But in accepting title after a foreclosure, the Government usually has no choice about acquisition. It cannot weigh costs against benefits, including the costs of relocation, before deciding to acquire. Congress must have been aware of this very fundamental and obvious difference; an open-ended program whose cost is incalculable is not simply to be presumed in a total absence of expressed Congressional intent.

The majority opinion argues that "the mandate of the Act is precisely contrary: if the costs are too much for HUD, then the demolition should not take place."[19] This statement once again blithely ignores the issue that the majority would fain forget: that this "acquisition," *and* the subsequent action by HUD, was compelled, was *in*voluntary, and thus was not for a "project or program" within the meaning of the Act. The undisputed facts here show that HUD

was forced by the mortgagee to take over Sky Tower, was confronted with a situation under which the housing could not be rehabilitated and then rented at rates permissible under the regulations,[20] and hence, more than a year after the involuntary acquisition, was forced to go the route of demolition preparatory to building something economically viable. This case is a good illustration of why Congress did *not* in the statute, either under the "acquisition" or the "notice" clause, compel HUD to pay relocation benefits in such an involuntary—and financially incalculable—situation. The majority's verbal shrug of the shoulders—"if the costs are too much for HUD, then . . . ."—is an attempted brushoff of some very weighty practical operating budget considerations to which Congress, if it had desired to do what the majority claims it did, would have been compelled to give serious and detailed attention.

My colleagues' position in interpreting the statute here is not only directly contrary to that of the Second Circuit in *Caramico* but is also in direct conflict with the Seventh Circuit in *Alexander v. HUD*.[21] *Alexander* involves the now familiar story of an apartment project in default on the loan, continuing default, HUD foreclosure and taking over the property. The Riverhouse apartment complex was plagued by unsafe conditions, nonpayment of rent, and excessive cost of bringing the project into good condition—remarkably similar to Sky Tower here. HUD then did precisely what it did here, *i. e.*, caused notices to vacate to be served on all tenants. The plaintiff tenants sought relocation benefits, asserting that the notice to vacate made them eligible for benefits afforded to "displaced persons" within the meaning of the Act. The District Court granted summary judgment for the defendant HUD, holding that the Act was inapplicable to the closing of the Riverhouse project, and making the same analy-

---

17. 509 F.2d at 698.

18. *Ibid.*

19. Maj. op. at —— of 187 U.S.App.D.C., at 598 of 571 F.2d.

20. *See* pp. —— ——, pp. 601–602 of 571 F.2d *supra.*

21. 555 F.2d 166 (7th Cir. 1977), *rehearing denied*, 19 September 1977.

sis of the statute that the Second Circuit had made in *Caramico* and that I have urged here.

The Seventh Circuit unanimously affirmed, pointing out that "[e]ligibility for URA benefits is also based on the requirement that a person be displaced 'for a program or project undertaken by a federal agency, or with federal financial assistance.' 42 U.S.C. § 4601(6). This requirement has been interpreted to mean construction of new federal projects." [22] The Seventh Circuit then discussed *Caramico* at some length, and emphasized the significance of the Second Circuit's "[f]inding a crucial difference between mortgage insurance acquisitions and acquisitions under programs covered by URA." [23] The difference, according to the Seventh Circuit, was that "the Second Circuit characterized the former as 'random and involuntary while normal urban renewal contemplates a conscious government decision to dislocate some so that an entire area may benefit.'" [24] The Seventh Circuit thus agreed completely with the Second Circuit in holding that involuntary mortgage foreclosure acquisitions were not within the "programs or projects" contemplated by the Act.

Other statutory provisions, cited by *Caramico*, also suggest that acquisition by involuntary foreclosure does not come within the Uniform Relocation Act. 42 U.S.C. § 4626(a), for example, provides authority for agency action "[i]f a Federal project cannot proceed to actual *construction*" (emphasis added). And 42 U.S.C. § 4651 on methods of acquisition establishes policies on appraisal, negotiation and eminent domain.

In sum, if this acquisition is understood as having been involuntary, and if the Second and Seventh Circuits' definition of "project" as excluding such involuntary acquisitions is accepted, then appellees are not "displaced persons" within the meaning of the "acquisitions" clause in the definition. For to the extent that appellees can be said to have moved from Sky Tower as a result of the HUD acquisition, that acquisition was not "for a program or project undertaken by a Federal agency" as contemplated by the Uniform Relocation Act.

## III.  THE NOTICE CLAUSE

The position of the majority is that whether or not appellees are "displaced persons" under the acquisitions clause they are "displaced persons" under the notice clause because they moved as a result of HUD's notice to vacate so that HUD could carry out its "project" of demolishing Sky Tower. The majority's reading of the notice clause, however, is not consistent with the purpose that Congress meant it to serve. Moreover, the majority opinion has misunderstood the argument HUD has advanced and is thus not even responding to the reading urged by HUD, which is indeed the correct interpretation.

Before beginning this analysis it may be helpful to set out the relevant text of the definition of "displaced person: " [25]

> The term "displaced person" means any person who . . . moves from real property . . . as a result of the acquisition of such real property, . . . or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency . . . . .

### A.

The majority says that HUD denies the applicability of the notice clause by not classifying demolition as a "project," quoting HUD's brief [26] that only "a federal construction or rehabilitation project, such as public works or urban renewal" constitutes

---

**22.**  *Id.* at 169 (citation omitted).

**23.**  *Id.*

**24.**  *Id., quoting* 509 F.2d at 698.

**25.**  42 U.S.C. § 4601(6) (1970).

**26.**  HUD Brief at 15.

a "project" in HUD's estimation.[27] The sentence the majority partially quotes, however, is *not* making the argument attributed to it. The sentence quoted in full reads as follows:

> The legislative history shows that Congress intended to provide benefits only to people who were forced to move because of acquisition consciously and voluntarily undertaken to further a federal construction or rehabilitation project, such as public works or urban renewal.

This full sentence is further quoted in context in the long excerpt from the HUD brief reproduced *infra.* The overall argument advanced by HUD is that the Act requires an *acquisition* for a project, such as public works, to satisfy the definition of "displaced persons." HUD doubtlessly concedes that if Sky Tower were voluntarily and consciously acquired, *e. g.*, by eminent domain, in order to demolish it and sell the vacant land, there would be acquisition for a "program or project."

A careful reading of HUD's brief shows that it never argued at all that a demolition, rather than a construction, is not a "project." Not only would this argument generally be rather simple-minded, because demolition usually precedes construction, but HUD would have to know that it would be inapplicable here, as Sky Tower was concededly being torn down to make way for the construction to single-family units. Rather than making this clearly flawed argument, the HUD Brief is advancing a reading of the notice clause based upon the purpose Congress intended for it.

To avoid the ambiguity of paraphrasing HUD, reproduced in the text below is the portion of the HUD Brief (pp. 13–15) which contains its argument on the meaning of the notice clause:

> Apparently, the district court considered the involuntary nature of HUD's acquisition irrelevant where, as here, the person moves "as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency,"

even though it might be relevant where (as in *Caramico*) the tenants move "as a result of the acquisition of * * * real property * * * for a program or project undertaken by a Federal agency * * *." However, the Second Circuit made clear that in *Caramico* it was interpreting the phrase common to both clauses, "for a program or project undertaken by a Federal agency" rather than the term "acquisition" which appears only in one clause. Moreover, there is no basis for distinguishing between the nature of the acquisition in the two provisions. An "acquiring agency" in the "notice" clause should refer to the same type of acquisition as does the "acquisition" clause.[10] [[10] There is, of course, a presumption that the same word used in different parts of a single statute is intended to have the same meaning each time. *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87, 55 S.Ct. 50, 79 L.Ed. 211 (1934)]. The volitional nature of the acquisition is the same for both classes of displaced persons. And in both clauses there must be acquisition *"for* a program or project." At the time HUD acquired Sky Tower, no decision regarding disposition of the property had been made. Over a year elapsed before HUD decided to raze the buildings. Thus, the property was not acquired for any program or project. *The provision relied on by the district court (the notice provision) was enacted to assure that people who move prior to actual acquisition can receive benefits if they receive a notice from the acquiring agency of its intention to acquire the property* [emphasis added]. Therefore, benefits accrue to an individual before acquisition occurs and even in the event it never occurs. H.Rept.No.1656, 91st Cong., 2d sess. 4 (1970). It was not intended to make relocation benefits available for different types of acquisitions or for different classes of programs or projects than the "acquisition" clause.

The legislative history shows that Congress intended to provide benefits only to

---

**27.** Maj. op. at —— of 187 U.S.App.D.C., at 595 of 571 F.2d.

people who were forced to move because of *acquisition* consciously and voluntarily undertaken to further a federal construction or rehabilitation project, such as public works or urban renewal [emphasis added.]

As can be seen from this excerpt, HUD is contending that *even as to tenants who seek to qualify as "displaced persons" under the notice category,* it is dispositive whether the *acquisition* was *for a project or program,* that is, whether the acquisition was made as a voluntary and conscious choice. This view is textually based, as explained above, on a reading of "acquiring agency" in the notice clause as referring back to the first clause, that is, to an agency which is *acquiring* property *for* a voluntary and conscious "program or project." And the HUD view is further based, as shown by the citation to the House Report, upon the legislative intent that the notice clause should ensure coverage of those who move prior to acquisition and even in the event it never occurs.

The majority opinion is thus grossly in error when it claims ". . . the government's argument proves too much. If an 'acquisition' as that term is used in the acquisition clause is also required under the notice clause, then the notice alternative would be rendered surplusage." [28] The notice clause was put in to take care of persons displaced in advance of a *proposed acquisition which is never consummated,* as is shown in the text of this opinion, *infra.*

Likewise, the majority claim that "[t]he government's argument that the notice clause requires, *in addition,* that an agency *acquire* property for a government program or project, would artificially restrict the coverage . . ." [29] This is not the government's argument at all. The government does not say that for a person to be displaced under the notice clause the agency *must acquire* the property, only that the agency *propose to acquire* and give written notice to that effect. This is the whole purpose of the notice clause; it is the majority's erroneous construction of the government's argument which alone would create a "surplusage."

## B.

With the HUD position in this case now fairly set out, it appears that due to the serious clash of views, textually and otherwise, on the proper reading of the notice clause, an independent examination of the legislative history is now necessary to determine the purpose Congress meant the notice clause to serve.

The Uniform Relocation Act of 1970 originated in the Senate as S.1. As reported out of the Committee on Government Operations and as passed by the Senate, S.1 defined a "displaced person" as essentially any person moved from real property "as a *result of* the acquisition *or reasonable expectation of* acquisition of . . . real property, in whole or in part, by a Federal or State agency." [30] This language was patterned apparently [31] upon the definition of the 1968 Highway Act [32] which had also referred to a "displaced person" as someone moving "as a result of the acquisition or reasonable expectation of acquisition." S.1, however, had dropped the reference of the Highway Act to "acquisition of such real property, which is *subsequently acquired*," [33] thereby *broadening* the definition to cover persons who move due to a reasonable expectation of acquisition even though the property is not later acquired. An examination of the deleted phrase— "which is subsequently acquired"—shows

**28.** Maj. op. at —— of 187 U.S.App.D.C., at 596 of 571 F.2d.

**29.** Maj. op. at —— of 187 U.S.App.D.C., at 596 of 571 F.2d (emphasis in original).

**30.** S.1, 91st Cong., 1st Sess. § 105(1)–(5), *reprinted in* 115 Cong.Rec. 31372 (1969) (emphasis supplied). *See id.* § 110.

**31.** S.Rep.No.488, 91st Cong., 1st Sess. 2 (1969). *See also* 115 Cong.Rec. 31535 (1969) (remarks of Sen. Cooper).

**32.** Pub.L.No.90–495, 82 Stat. 834, § 511(3) (repealed 1971).

**33.** *Ibid.* (emphasis added).

the undeniable broadening effect of the deletion, for the deleted phrase was an important limitation.

When S.1 was reported from the House Public Works Committee, however, the language of the definition had been changed to its present form, the result of recognition of the expansion accomplished by the deletion. A "displaced person" was someone who moved from real property "as a result of the acquisition of such real property . . or as the result of the written order of the acquiring agency to vacate real property" for a federal or federally-funded "program or project." [34] After this change by the House Committee from the language about "reasonable expectation," the House Report, accompanying the revised S.1, assumed particular importance in divining the meaning of the notice clause. After the House Report tracks the terms of the revised S.1 in describing the definition of "displaced person," it immediately adds: "*If a person moves as a result of such a notice to vacate, it makes no difference whether or not the real property actually is acquired.*" [35] While this is the only sentence in the House Report explaining the meaning of the notice clause, its evolution and antecedents render this comment clear and unmistakable in meaning. The House Report continues: [36]

It is immaterial whether the real property is acquired before or after the effective date of the bill, or by Federal or State agency; or whether Federal funds contribute to the cost of the real property. The controlling point is that the real property must be acquired for a Federal or Federal financially assisted program or project.

The Report then gives various examples, such as that it *is* acquisition for a Federal project if a state acquires property, even with only state money, for the right-of-way for a Federal-aid highway. There are *no*

examples given of "displaced persons" where the move was made as a result of notice regarding property which was *already* in the ownership of the Federal agency.

Following approval by the House, the revised S.1 was returned to the Senate, the House indicating a refusal to go to conference. There were other changes, particularly involving judicial review, that occupied the attention of the Senate in its renewed consideration. The only apparent reference to the change in definition was in a memorandum on "points of significant concern" submitted by Senator Percy on behalf of the Administration. The relevant paragraph provides as follows: [37]

*Definition of displaced person.* The House bill would limit the status of displaced person to those who move as the result of the acquisition of, *or written notice to vacate,* real property. The Senate version would provide a broader definition which includes those who move as the result of acquisition *or reasonable expectation of acquisition.*

In the estimation of the Administration, then, the House language requiring notice was seen as narrowing the coverage from those who move as the result of "reasonable expectation of acquisition" to those who receive a written notice prior to such expected acquisition, although the memorandum makes no judgment about the desirability of ·this change. The Senate again passed S.1 and the President signed it into law.

Looking back at the legislative history, the purpose which should be attributed to the notice clause seems clear. The original bill, S.1, had provided a broad definition of "displaced persons," covering those who moved with a "reasonable expectation" that an agency would acquire their housing for a project even if the agency did not ultimately make the acquisition. This definition,

---

**34.** S.1, 91st Cong., 2d Sess. § 1(6), *reprinted in* 116 Cong.Rec. 40163 (1970) (emphasis added).

**35.** H.R.Rep.No.1656, 91st Cong., 2nd Sess. 4, *reprinted in* [1970] U.S.Code Cong. & Admin. News, pp. 5850, 5853.

**36.** *Id.* (emphasis added).

**37.** 116 Cong.Rec. 42139 (1970) (emphasis supplied).

however, appears to present obvious problems of administration, particularly as it may call for many individual determinations on "reasonableness" based on the facts of each case, with all determinations subject to judicial review.[38] The House change, to replace "reasonable expectation" with "written notice" from the "acquiring agency," appears to have been an effort to simplify and regularize the definition by limiting coverage to those with specific notice. The change would also have the effect of narrowing the definition since generally for most projects, like highway construction, there would be fewer people receiving written notice to vacate than would have a reasonable expectation that their residences might be acquired.

The House and Senate versions, though, shared *the same purpose*: as the House Report said, *this supplemental definition meant to cover those given notice who moved prior to acquisition or who moved even though the anticipated acquisition did not occur.* This appears to be the limited purpose envisioned for the notice clause. It was designed to provide a more concrete standard than "reasonable expectation" of acquisition. If anything, the change by the House *limited* the definition, and certainly did *not vastly expand it by covering* all persons displaced with notice from property *already owned and acquired* by the agency. In short, the "displaced persons" meant to be covered by the Uniform Relocation Act are those connected with the acquisitions or anticipated acquisitions by agencies for their programs.

*It is thus dispositive here whether Sky Tower was acquired for a program or project, as discussed in Parts I and II above. This is the basic issue which separates my view from the views of my colleagues; whether the acquisition or the notice clause is involved, the acquisition or notice of proposed acquisition must be an "acquisition*

for a program or project." There can be no such acquisition if HUD's accession to title is involuntary. Caramico, Alexander, and Harris, supra.

### C.

The meaning of the notice clause found in the legislative history also draws support from other provisions of the Act as well as from the available case law. Title I of the Uniform Relocation Act contains the general provisions, including definitions; Title II sets out the actual relocation assistance to be provided. Section 202, for example, specifies the compensation for moving and related expenses; it begins:[39]

Whenever the *acquisition* of real property *for a program or project* undertaken by a Federal agency in any State will result in the displacement of any person on or after January 2, 1971, the head of such agency shall make a payment to any displaced person . . . .

Section 205, concerning the advisory services for relocation assistance, also contains an identical introduction, about the "acquisition" of real property.[40] These occasional introductions are presumably meant as rough paraphrases of the coverage of the Act, being of significance here, therefore, for their focus on "acquisition" for a project as a condition for benefits. There is no suggestion that these clauses, found seemingly at random in two of the sections of Title II, mean that there should be different benefits available to "displaced persons" qualified by the acquisition clause than for those qualified by the notice clause, defined by majority in such a way as to be independent of the acquisitions requirement.

Title III of the Act, concerning uniform acquisition policy, also appears to lend some support to the HUD position. Section 301(5) directs all agencies to schedule construction projects in such a way that no

---

**38.** *See, e. g., United States v. Braddy,* 320 F.Supp. 1239, 1241 (D.Or.1971), which held that by the phrase "reasonable expectations" in the 1968 Highway Act "Congress intended the proper state agency to weigh each case on its own merits."

**39.** 42 U.S.C. § 4622(a) (1970) (emphasis added).

**40.** *Id.* § 4625(a).

person occupying real property is required to move "without at least ninety days' *written notice . . .* of the date by which such move is required."[41] This clearcut directive, which agencies must meet "to the greatest extent practicable," ties in well with the "written notice" clause as an alternative definition. Once a person receives the written notice directed by section 301(5), he assuredly becomes a "displaced person" and can begin to take advantage of the Act's benefits, including advisory services and rental replacement supplements, at least ninety days before actually having to vacate.

Lastly, there is unanimous case support for the HUD view that the Uniform Relocation Act does not apply to persons displaced from *property already in the ownership* of the concerned agency, even though a notice to vacate for a project may be given. In *Harris v. Lynn,*[42] the tenants seeking to qualify as "displaced persons" were required to move so that the ill-fated public housing projects of Pruitt-Igoe in St. Louis could be demolished. The tenants argued that the projects were essentially "federal" lands, due to various loan and trust arrangements, and "that to deny relocation benefits to individuals forced to move from 'federal' lands while granting such benefits to those displaced as a result of the 'acquisition' of such lands would run counter to the Congressional purpose and intent."[43] The District Court disagreed:[44]

> It is clear to us, however, that Congress advisedly limited the eligible class (in Section 4601(6)) to those forced to move as a result of an "acquisition." There are, for example, a number of references

in the Act to "acquisition" and "acquiring agency."

Those tenants, although displaced-in-fact, were thus denied coverage because they had not moved as a result of an *acquisition* of their dwellings. On appeal the Eighth Circuit "adopt[ed] the factual statement and legal reasoning set forth in the District Court's opinion and affirm[ed] that decision as to the issues it reaches."[45]

If, as the Eighth Circuit has maintained, Congress meant to provide coverage only for displacements connected with acquisitions, it would depart from that purpose to read the notice clause as the majority reads it here. Whenever an agency wishes to vacate property it already owns for some new "project or program," it presumably gives written notice to the occupying tenants. If that notice alone is said to qualify the tenants as "displaced persons," then the Act will be applying to all varieties of displacements that are not remotely related to "acquisitions." Based on the legislative history, other provisions of the statute, and available case law, I believe instead that in its definition of "displaced person" the Uniform Relocation Act is concerned with displacements from "acquisitions." And, thus, in this case, since the involuntary taking of the property due to default and foreclosure was not an "acquisition" for a "program or project," these appellees cannot be "displaced persons."

This was exactly what the Seventh Circuit held in *Alexander v. HUD, supra.* The court's description of plaintiffs' argument in *Alexander* neatly describes plaintiffs' argument here: "The tenants in this case

---

41. *Id.* § 4651(5) (emphasis added).

42. 411 F.Supp. 692 (E.D.Mo.1976), *aff'd,* 555 F.2d 1357 (8th Cir. 1977). It appears that the *Harris* courts treated "acquisition" in the "acquisition" clause and "acquiring agency" in the "notice" clause as functional equivalents, thus disposing of the majority's attempt to distinguish this case. Maj. op. at —— & n.29, of 187 U.S.App.D.C., at 596 of 571 F.2d. Not only did the Court of Appeals "adopt the factual statement and legal reasoning" of the District Court, but also specifically stated, "The plaintiffs' eligibility for assistance, in essence, turned on the resolution of two issues: (1)

whether there was an 'acquisition' for a program or project of a Federal Agency, and (2) whether the demolition was part of a comprehensive city demonstration program . . ." 555 F.2d at 1360. The majority's efforts to distinguish *Harris,* like its efforts to distinguish *Alexander,* simply won't wash.

43. 411 F.Supp. at 695.

44. *Id.* (emphasis added).

45. 555 F.2d at 1359.

contend that *Caramico* is distinguishable factually since in *Caramico* HUD was not the mortgagee, did not foreclose on the mortgage, and did not purchase the property from which the tenants were evicted. Further, plaintiffs argue *Caramico* involved the *acquisition aspect* of 42 U.S.C. § 4601(6), whereas here plaintiffs rely on the aspect of that section dealing with a *written order to vacate* by the acquiring agency." [46] The Seventh Circuit squarely and unanimously rejected this argument, the position of my two colleagues here, saying: "Although distinguishable with respect to particular facts, *Caramico* involved the same inquiry as presented by this case, i. e., whether the activity of the governmental agency was 'for a program or project undertaken by a Federal agency, or with Federal financial assistance.' In this case, we conclude that HUD's written order to the tenants of Riverhouse to vacate by December 31, 1974 was not for such a program or project." [47] No legal legerdemain can distinguish the Seventh Circuit's holding in *Alexander* from the case at bar.[48]

## IV. OVERALL PURPOSE OF THE ACT

As the Seventh and Eighth Circuit cases and this case all illustrate, there may be persons displaced in fact from buildings already in the ownership of state or federal agencies who do not qualify as "displaced persons" even though the displacement results from a "program or project," i. e., demolition. A reading of the definition as it was intended by the Uniform Relocation Act leads, as I have shown, to this conclusion. Before resting with this conclusion, however, it may be instructive to ask whether this outcome, excluding these appellees from coverage, is consistent with the overall structure of the Act, apart from whether it accords with the definition. After all, as the Act itself makes clear, a primary purpose is to assure that displaced persons "shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole." [49] Is there any support in the Act, apart from the definition, for establishing coverage for persons displaced due to acquisitions for programs but denying coverage for persons displaced from property already owned by the agency?

Looking elsewhere in the Act, it appears that Congress made an express provision that certain persons displaced in fact by federal aid or a federal agency would be considered "displaced persons" *even though the displacement may not have resulted from acquisition.* As set out in full below, section 217 of the Act [50] provides that persons who have to move as a result of certain federal aid programs involving urban renewal shall, "for the purposes of this [title], be deemed to have been displaced as the result of the acquisition of real property." In other words, under these named programs there may be extensive displacement, from public housing projects, for example, without any federal or federally-financed state acquisition of real property. Section 217, therefore, is designed to cover displacements caused by these named activities even though there was no acquisition. This section does what Congress did not do in the section at issue here, and rather completely refutes the majority claim "that if congress had explicitly considered . . . ,

---

**46.** 555 F.2d at 169 (emphasis supplied).

**47.** *Ibid.*

**48.** The quoted sentence from *Alexander* by which in note 27 the majority attempts to distinguish the Seventh Circuit case, constitutes simply an additional reason for a conclusion already reached on the *Caramico* rationale, as a reading of the whole opinion plainly shows.

**49.** 42 U.S.C. § 4621 (1970).

**50.** 42 U.S.C. § 4637 (1970):
   A person who moves or discontinues his business, or moves other personal property, or moves from his dwelling on or after January 2, 1971, as a direct result of any project or program which receives Federal financial assistance under title I of the Housing Act of 1949, as amended, or as a result of carrying out a comprehensive city demonstration program under title I of the Demonstration Cities and Metropolitan Development Act of 1966 shall, for the purposes of this subchapter, be deemed to have been displaced as the result of the acquisition of real property.

it would have approved an interpretation of the Act making benefits available for such persons." [51] Congress did so—when it desired to do so.

If the notice clause had the meaning given it by the majority, it would have been completely unnecessary for Congress to have enacted section 217. The persons displaced by these urban renewal programs would undoubtedly have been given notices to vacate "for" these projects and would have been qualified under the notice clause, as the majority reads it. The fact, however, that Congress had to provide special coverage for these persons suggests that it did not intend that all persons displaced from property already owned by an agency would be eligible for benefits. The fact that Congress provided special coverage as to certain named programs also suggests that it is for Congress to decide when to extend coverage to other persons displaced from property already owned. There may be reasons of equity or policy for the Uniform Relocation Act to reach *all* persons displaced as a result of federal programs, regardless of whether their property is acquired or already owned by the relevant agency. But as the Act is now structured we are obliged to follow the definition as phrased and as intended and to leave questions of additional coverage to Congress.

As a closing note of caution, I would ask the majority to consider the consequences of what may well have happened here had HUD accepted the meaning of the notice clause as the majority has interpreted it now. If HUD knew that once it acquired a building with tenants, however involuntary the acquisition, these tenants would become "displaced persons" if HUD ever served them with notice to vacate "for" another project, then what could very likely have been the HUD response? *HUD might well have insisted*, as it had every legal right to do, *that the mortgagee evict all the tenants* before HUD would accept the property and

pay out the mortgage insurance. Being evicted by the mortgagee, the tenants would clearly not have been "displaced persons" according to the interpretation in *Caramico* and even more squarely on point in *Alexander*.[52] In brief, as the notice definition now stands in this Circuit, there will be greater incentive for HUD to *insist upon taking title without tenants in occupancy*, thereby avoiding what it regards as the "substantial" financial burden of the majority's interpretation.[53] The irony of the result in this case is that the majority may be hurting the urban poor among the displaced more than helping them.

## V.  CONCLUSION

In summary, I agree with the Second Circuit in *Caramico v. HUD*, with the Eighth Circuit in *Harris v. Lynn*, and with the Seventh Circuit in *Alexander v. HUD*. All three of our sister circuits have held that where there is an *in*voluntary acquisition of property by HUD the evicted tenants are not "displaced persons" within the meaning of the Act. My colleagues have tried valiantly to distinguish *Caramico* by saying it clearly turned upon the "acquisition" clause defining "displaced persons," but the Eighth Circuit in *Harris v. Lynn* and the Seventh Circuit in *Alexander v. HUD* dealt with the "notice" clause definition of displaced persons, which is involved in our case. In each instance the Court of Appeals unanimously affirmed a District Court reaching the decision I would reach here. In light of the analysis of the statute in these three cases by twelve federal judges, and the unanimous· conclusion reached in each case, I respectfully suggest that the reasons advanced by my two colleagues here are unpersuasive, certainly inadequate to overcome the weight of both reason and authority manifested in the other three circuits. I therefore respectfully dissent.

---

**51.**  Maj. op. at —— of 187 U.S.App.D.C., at 598 of 571 F.2d.

**52.**  *See also Moorer v. HUD*, 561 F.2d 175 (8th Cir. 1977).

**53.**  HUD Brief at 21–23.