Sadie E. COLE et al., Plaintiffs,

v.

James T. LYNN et al., Defendants.

Civ. A. No. 74–1872.

United States District Court,
District of Columbia.

Feb. 7, 1975.

Florence Wagman Roisman, Ann K. Macrory, Washington Lawyers' Committ. for Civil Rights, Washington, D. C., for plaintiffs.

Robert M. Werdig, Asst. U. S. Atty., Washington, D. C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GESELL, District Judge.

This is a class action brought by present and former tenants [1] challenging the decision of the Secretary of the Department of Housing and Urban Development (HUD) to demolish Sky Tower, a multifamily housing project, renovated with federal funds at substantial expense, for low-income families in this city. The matter came before the Court on plaintiffs' application for preliminary injunction. A hearing was held and after considering the testimony, affidavits, briefs and arguments of counsel, the Court issued a Temporary Restraining Order on January 28, 1975, to prevent further demolition pending the preparation of findings of fact, conclusions of law and an appropriate form of preliminary injunction. The Court's detailed findings and conclusions are set out herein and present the basis on which the Court has concluded that a preliminary injunction is required.

### Background of the Project

Sky Tower was built in the mid-1950's as a 217-unit garden apartment complex consisting of 19 sturdy brick buildings located in the far Southeast area of the District of Columbia. In 1971, the com-

---

[1]. The class consists of all present tenants of Sky Tower Apartments and all former tenants who moved out of the project after June 15, 1973, the date HUD acquired title.

The Court certified the class pursuant to Fed.R.Civ.P. Rule 23(b)(2) in a separate order.

plex was purchased by a non-profit corporation which proposed to rehabilitate it and transform it into a 150-unit complex of larger units to serve low- and moderate-income tenants with large families. A $2.9 million mortgage to cover the acquisition and rehabilitation costs was insured by HUD pursuant to Section 236 of the National Housing Act, 12 U.S.C. § 1715z–1. Pursuant to Section 236, HUD also subsidized the interest rate on the mortgage. In addition, HUD undertook to pay rent supplement benefits on behalf of up to 60 households and 20 of the units at Sky Tower were to be leased to the National Capital Housing Authority (NCHA), which would re-lease them, at public housing rents, to households eligible for public housing under the United States Housing Act of 1937, as amended, 42 U.S.C. § 1401 et seq.

Rehabilitation work began at Sky Tower in May of 1971. By November, 1972, two contractors had defaulted in their performance of the rehabilitation work. At that time, eight buildings had been completely rehabilitated, three were approximately 50 percent rehabilitated, and work had not yet begun on eight others. Although the non-profit sponsor wished to complete the rehabilitation work, and the mortgagee was prepared to allow that, HUD insisted that the property be foreclosed. See 24 C.F.R. § 236.56. Title was transferred to HUD on June 15, 1973.

When HUD took title to the property, the eight rehabilitated buildings had new air-conditioning and heating systems, new kitchens, laundry facilities and other amenities. These buildings, all of which remain standing, comprised 63 units: 18 two-bedroom; 15 three-bedroom; 21 four-bedroom; 1 five-bedroom and 8 six-bedroom. Rents ranged from approximately $75 to $225. Approximately 70 families were residing at Sky Tower.

After acquiring title to the property, HUD employed a management firm, Urban Management Services, Inc., to operate the project and new leases were executed with the tenants. The lease with NCHA was continued and the public housing tenants continued in possession. Urban Management Services executed new rent supplement leases with the tenants who had been receiving rent supplement benefits. HUD then began to consider what to do with the property.

HUD considered several alternatives to demolition consisting of various permutations of partial rehabilitation and rent supplements. In each case, insufficient subsidies were available to insure economic feasibility without risks that "would not be in the best interests of the Secretary" and therefore it was decided that there was "no alternative" to demolition. On September 17, 1974, HUD concluded that the property would be cleared and the vacant land made available for sale to developers for the construction of single-family homes for the middle class. The cost of demolition will exceed $150,000, but the gross return from sale of the land is projected at only approximately $58,000.

When HUD demolition plans became known, tenants were under increasing pressure to leave, vandalism increased and gradually the whole project became moribund except for a few families that still remain, presumably due to inability to find comparable living arrangements. Those who felt obliged to leave have found inferior quarters at higher rent. Indeed, no comparable low-income housing of equal quality was available to any of the tenants at the time the demolition decision was made. In fact, at all relevant times, there has been an acute housing shortage in the District of Columbia, which has been particularly serious for low-income persons with large families, the very class Sky Tower serves. Thus, NCHA has a current waiting list of over 4,000 families, concentrated in the four-bedroom and larger category. Only one other HUD-assisted project in the District of Columbia metropolitan area has any six-bedroom units whatsoever.

## HUD's Obligations

This litigation has brought into sharp focus a most anomalous situation. HUD, an agency directed by Congress to implement national housing policy by creating decent, sanitary housing for low-income families and generally authorized to foster improved living conditions in slum-like areas, proposes to wreck and demolish eight low-income apartment buildings containing 63 apartments which were recently renovated at a net "sunk" investment of over $2 million in Government money and are now occupied by low-income tenants. It is planning to take this action against the expressed wishes of the Government of the District of Columbia, and squarely in the face of an acute low-income housing shortage which causes much distress in this community. HUD is proceeding without published demolition regulations,[2] without providing even minimum notice and rule-making hearings, and without any statement of its reasons adequately explaining why other alternatives short of demolition expressly provided by federal statutes are disregarded or deemed impractical. *See* 12 U.S.C. §§ 1715z–3(a)(2); 1713(*l*).

HUD was created by Congress to carry out a national housing policy which Congress has developed, refined and implemented over a period of years by a series of enactments. In brief, that policy is designed to remedy acute shortages of decent, sanitary housing for low-income families and to preserve rather than destroy existing housing by rehabilitation and other measures. *See* 42 U.S.C. § 1441a, as amended by § 801 of Pub.L. 93–383, 88 Stat. 633 (1974). "HUD is obliged to follow these policies. Action taken without consideration of them, or in conflict with them, will not stand." Commonwealth of Pennsylvania v. Lynn, 501 F.2d 848, 855 (U.S.App.D.C., 1974).

■ Assuming, although it is far from clear,[3] that the Secretary is authorized to demolish useful buildings built with Government funds that are serving an undisputed housing need, he must yet act in an appropriate manner and for a rational reason related to the achievement of the statutory objectives. It is apparent he has done neither in this instance.

■ The decision to demolish was apparently substantially influenced by a single, broad, sweeping policy determination not made with any particular property in mind, certainly not Sky Tower, which, by its very nature, perforce eliminated a need to hear tenants, consider alternatives or proceed to a rationalized judgment consistent with national housing policy. HUD has declared that it is "HUD's primary objective to dispose of all acquired multifamily properties at the earliest possible date at the highest price obtainable in the current market." HUD, Property Disposition Handbook for Multifamily Properties, HM 4315.1 (Feb. 17, 1971) ¶ 21 at 3.[4] This is an oversimplified and inappropriate premise. The Secretary's statutory mandate to seek to better housing conditions for low-income groups does not evaporate when a Section 236 project comes into his hands through foreclosure.[5]

---

2. *But see* 5 U.S.C. § 552(a)(1)(D).

3. Once the property is acquired by the Secretary, Section 207(*l*) of the Act, 12 U.S.C. § 1713(*l*), authorizes the Secretary "to deal with, complete, reconstruct, rent, renovate, modernize, insure, make contracts for the management of, or establish suitable agencies for the management of, or sell for cash or credit or lease in his discretion, any property acquired by him under this section . . . ."

4. Reinforced recently by HUD, Notice HM 74–57 (Sept. 11, 1974), at 1: "The primary objective of the Property Disposition program is REDUCE THE INVENTORY OF ACQUIRED PROPERTIES IN SUCH A MANNER AS TO ENSURE THE MAXIMUM RETURN TO THE MORTGAGE INSURANCE FUNDS."

5. HUD has already acquired 276 multifamily projects throughout the country by foreclosure, and more can be expected to come into its hands as the years go by. *Cf.* Commonwealth of Pa. v. Lynn, 501 F.2d 848 (U.S. App.D.C.1974).

■ Not only has the Secretary's discretion thus been unfortunately placed in a straitjacket of his own design, but the Secretary has proceeded in a fashion that prevents meaningful judicial review because minimal due process requirements and many sections of the entire statutory scheme from which the Secretary derives his overall authority have apparently been disregarded. The Secretary has apparently interpreted his authority as a grant to proceed in his absolute discretion in whatever manner he may, for convenience, choose. This is a fundamental mistake. While he has no doubt attempted to act in good faith, his discretion is not absolute. The exercise of his discretion is subject to court review when, as here, it is responsibly challenged by tenants affected and a *prima facie* showing has been made that he may have acted arbitrarily and irrationally.

### HUD's Omissions

The Secretary did not consider alternatives available to him and failed to afford a hearing.

There were, in fact, a number of alternatives which, as far as the record shows, HUD never considered, although available to it. HUD never considered continuing to operate the eight fully rehabilitated buildings as a rental property under its own management, and specifically maintained at oral argument it lacked the authority to do so. *But see* 12 U.S.C. § 1713(*l*). HUD never considered the impact of the new Section 8 subsidy program on its decision, although that program was enacted by the Congress on August 22, 1974, several weeks before the final decision to demolish the project was made on September 17, 1974, as part of the Housing and Community Development Act of 1974,

Pub.L. 93–383, 88 Stat. 633. It never considered selling the property at a loss, or indeed giving it away,[6] to a responsible private or public group which might operate it, with or without rent supplements. Finally, HUD did not consider selling only the rehabilitated buildings with full rent supplements.

■ Congress did not intend HUD to be a commercial lending agency. Rather it provided a series of options and alternatives which HUD might follow to achieve housing objectives. The Secretary cannot avoid giving full considerations to all available options to effectuate national housing policy. This is especially the case where a demolition of usable housing is proposed with absolutely no prospect or definite plan for providing new comparable housing to meet the continuing housing needs of the area.[7] It is simply not a housing policy to tear down housing, not replace it and thus create more vacant land, a process that has been taking place in this city for far too long.

■ It is not for the Court to weigh the merits of the statutory alternatives available. The Court must not, should not, and cannot substitute its judgment for that of the Secretary, but it can require that he proceed with regard for due process. He must consider these alternatives and he must proceed under a meaningful procedure that will assure appropriate court review.

■■ Tenants and other affected interests must be heard and the Secretary's decision must be expressed rationally thereafter in a manner consistent with statutory alternatives and the various factors operating in each particular situation. An adversary proceeding is not required nor are all requirements of the Administrative Procedure Act a pre-

---

6. HUD determined it was "required" to receive a "minimum offering price" of $418,000 for the property "as is." Since it believed no one would pay that much, rather than lower the asking price, it determined to destroy the property, at a net loss of an additional $90,000.

7. The land purchaser, if one is found, would, it is hoped, sometime build "single family" homes for middle-income families. In today's world, this is "pie in the sky."

requisite. But HUD must at a minimum give the District of Columbia and the tenants who may be irreparably injured, as well as private interests involved in low-income housing construction and renovation, opportunity to be heard and to present proposals: *See* Thompson v. Washington, 497 F.2d 626 (U.S.App.D.C.1973); Marshall v. Lynn, U.S.App.D.C., 497 F.2d 643, cert. denied sub nom., 419 U.S. 970, 95 S.Ct. 235, 42 L.Ed.2d 186 (1974); Burr v. New Rochelle Municipal Housing Authority, 479 F.2d 1165 (2d Cir. 1973); Caramico v. HUD, 509 F.2d 694 (2d Cir. 1974).

As Judge Leventhal wrote in Thompson v. Washington, *supra*, 497 F.2d at 638:

> The propriety of affording due process protection requires an assessment of the issues presented for decision . . . and the capacity of tenants to present material relevant to resolution.

This case demonstrates how HUD's in-house decision-making process can become fatally infected by crucial factual errors which could easily have been cured by public hearings at which tenants, local officials, and other interested groups participate. HUD believed on the strength of a consultant's report citing unnamed sources that the District of Columbia Government wanted the project destroyed and acted in part on that basis. The uncontradicted public testimony of the representative of the District of Columbia Government was to the contrary. Moreover, HUD concluded that because each heating system served two buildings, it would not be feasible to demolish only incompleted buildings since the remaining fully renovated buildings would be left with no heating system "in many instances." In fact, uncontradicted affidavits from those familiar with the property maintain that the eight rehabilitated buildings either have their own heating systems or share heating systems with one another. Fi-

nally, HUD's internal memoranda repeat the conclusion, initially valid, that Sky Tower is part of a "high density neighborhood" without regard for the fact that between June, 1973, and September, 1974, density was substantially reduced by the destruction of multifamily projects on either side of Sky Tower. Such factual errors, which may well have influenced HUD's final decision by causing it to act on false premises, could have been corrected if an appropriate public hearing had been held.

■ For the required hearing to satisfy minimum requirements, HUD must first indicate the principal considerations that should affect the Secretary's determination and the resources available. A rational statement of the ultimate decision and the reasons for it must be provided which will then be reviewable by the courts for abuses of discretion. *See* 5 U.S.C. § 701; Citizens to Preserve Overton Park v. Volpe, 401 U. S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). As Justice Harlan expressed it in the Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968):

> The court's responsibility is not to supplant the [agency's] balance of . . . interests with one more nearly to its liking, but instead to assure itself that the [agency] has given reasoned consideration to each of the pertinent factors.

■ Finally, very substantial questions exist with regard to HUD's compliance with the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., in that no Environmental Impact Statement has been prepared and the "special environmental clearance" worksheet incorporating a finding of no adverse environmental impact was not drawn up until after demolition had begun and this lawsuit had been filed. *See* HUD, Circular 1390.1 (July 16, 1971); Hiram Clarke Civic Club v. Lynn, 476 F.2d 421 (5th Cir. 1973); Maryland-Nat. Capital Park & Planning Comm. v. U. S. Postal

Service, 159 U.S.App.D.C. 158, 487 F.2d 1029 (1973).

*The Need for a Preliminary Injunction*

Since HUD has clearly failed properly to weigh the human values it was created by Congress to protect, closest judicial scrutiny into HUD's procedures and legal authority is required before the bulldozers and wrecking crews can be allowed to proceed further. The issues raised affect the well-being of the plaintiff class and this city. The public interest requires that tenants be kept in place until there has been a full and proper determination of their rights. Edwards v. Habib, 125 U.S.App.D.C. 49, 366 F.2d 628, 630 (1965) (Wright, J., concurring).

 A preliminary injunction is required to prevent irreparable injury to the tenants and to restore the situation to that which existed at the rehabilitated buildings before the challenged demolition was undertaken. *See* Virginia Petroleum Jobbers Ass'n. v. FPC, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958); Westinghouse Elec. Corp. v. Free Sewing Machine Co., 256 F.2d 806, 808 (7th Cir. 1958). A very substantial and persuasive showing has been made by the tenants that the action of HUD was procedurally defective, that it proceeded on mistakes of fact and errors of law and that the likelihood that plaintiff will prevail is very high. *See* Dorfmann v. Boozer, 134 U.S.App.D.C. 272, 414 F.2d 1168, 1173 (1969).

The preliminary injunction entered herewith is designed to restore the tenants to their prior status and to take reasonable and necessary steps for their safety and sanitary living conditions *pendente lite.* These affirmative directives are ordered in the Court's discretion since a mere order maintaining the existing situation would defeat the public interest and the need to do equity in that vandalism, empty apartments and continuing unsafe conditions would, as a practical matter, effectively accomplish demolition by a process of erosion.

Only by filling the buildings with qualified needy tenants can the project remain viable pending final determination. This is one of those distinctive cases referred to by Judge, later Chief Justice, Taft in which "the status quo is a condition not of rest, but of action, and the condition of rest is exactly what will inflict irreparable injury." Toledo RR v. Pennsylvania Co., 54 F. 730, 741 (CC Ohio 1893). Mandatory, not merely prohibitory, relief is required at this preliminary stage to prevent continuing injury to plaintiffs, irreparable in nature. The additional expense and inconvenience to defendants is far outweighed on any balancing of the equities by the continuing serious threat of harm to the plaintiffs.

The Court assures defendants that it will proceed to final resolution expeditiously and will schedule that matter for trial on the permanent relief, if any, as soon as the parties can be ready.

*Conclusion*

In brief, the standing apartment buildings shall remain undemolished. They shall be restored to the standards existing before demolition started. The apartments in these buildings shall be made available immediately to prior tenants dispossessed. The existing rubble caused by demolition should be removed. Affirmative steps shall be taken to halt vandalism. Plaintiffs' motion for preliminary injunction is granted to the extent indicated in the attached Order entered this day on the basis of these findings of fact and conclusions of law.

ORDER OF PRELIMINARY INJUNCTION

Upon consideration of the testimony, affidavits, briefs and arguments of counsel and upon findings of fact and conclusions of law filed herewith, and the Court having determined that a preliminary injunction should be entered to be effective pending final decision of this case or further order of the Court, now therefore it is

Ordered that defendants, their officers, agents, servants and employees be, and they hereby are, enjoined

(1) from demolishing the building located at 1016 Wahler Place, S.E., and demolishing or seeking permit to demolish the buildings located at 1022, 1029, 1034, 1040, 1064, 1070, 1051, 1057 and 1075 Wahler Place, S.E., in the District of Columbia;

(2) from removing or permitting the removal of any appliances, fixtures or other items from any of the buildings above designated; and

(3) from evicting, removing or otherwise interfering with the tenancy of any tenant at Sky Tower, except in accordance with law for grounds arising subsequent to the date of this Order, and except that they shall, not later than February 28, 1975, arrange, permit and enable, at defendants' expense, the removal of the three families occupying 1070 Wahler Place, S.E., to comparable apartments in one of the rehabilitated buildings, and such apartments shall first have been put into decent, safe and sanitary condition; and it is further

Ordered that defendants are directed

(4) promptly to erect fences around the demolition site, to complete the demolition now in progress on 1063 and 1060 Wahler Place, S.E., in a prompt and safe manner, and promptly to remove at all demolished buildings all foundations and footings, old materials, debris, rubble and demolition equipment, grade the site to fill in holes and effectuate a safe condition and normally presentable appearance;

(5) to restore with reasonable diligence each of the units and common areas in the eight rehabilitated buildings to a condition at least as decent, safe and sanitary as that existing as of September 17, 1974, such work to begin immediately and proceed expeditiously with priority given apartments presently occupied and to include, though not be limited to, immediately replacing into the rehabilitated units the refrigerators, bathtubs and other appliances, and assuring a constant and reliable source of heat to all occupied buildings;

(6) to attempt immediately to locate all former tenants who left Sky Tower subsequent to September 17, 1974, and to permit any such tenant family to return to Sky Tower, such return to be arranged as promptly as the repair work and the schedules of the returning families may permit, and to pay all moving and lease termination penalties incurred by such tenants who decide to return (all previous tenants are to return under the terms of their previous tenancy, including rent supplements); provided, however, that this Order shall in no way limit the right of the defendants to rent space to persons other than such former tenants if space is available after the needs of former tenants have been met, giving priority to other members of the class; and

(7) promptly to arrange security services on a continuous basis in a manner reasonably adequate to prevent vandalism to the buildings; provided, however, that when the buildings are reoccupied to an extent the defendants deem adequate to make provision of security unnecessary, they may move the Court to be relieved from this obligation; and it is further

Ordered that defendants shall file with the Court and serve upon plaintiffs' counsel at the end of each week commencing February 17, 1975, a progress report stating with particularity the steps taken to carry out and implement this Order, and that counsel for the parties shall appear in open court at 9:30 a. m. on March 3, 1975, to determine a schedule for further proceedings in this cause.