Sadie E. COLE et al., Appellants,

v.

Patricia Roberts HARRIS, Individually and in her official capacity as Secretary of the United States Department of Housing and Urban Development, et al.

No. 77–1360.

United States Court of Appeals, District of Columbia Circuit.

Submitted without Oral Argument Nov. 7, 1977.

Decided Nov. 14, 1977.

See also 571 F.2d 590.

**614**

Florence Wagman Roisman and Adelaide M. Miller, Washington, D. C., for appellants.

Peter R. Taft, Edmund B. Clark and Charles E. Biblowit, Washington, D. C., for appellees.

Before BAZELON, Chief Judge, and McGOWAN and WILKEY, Circuit Judges.

Opinion for the Court filed by BAZELON, Chief Judge.

Opinion filed by WILKEY, Circuit Judge, concurring in the result.

BAZELON, Chief Judge:

This appeal arises out of the same litigation as *Cole v. Harris*, Nos. 75–2268 and 75–2269, 187 U.S.App.D.C. ——, 571 F.2d 590. There we held that former tenants of the Sky Tower apartments in Southeast Washington qualify for relocation assistance under the Uniform Relocation Assistance and Real Property Acquisition Policies Act,[1] and that the offer of leave to return to Sky Tower *pendente lite* did not terminate the eligibility for benefits of those tenants who chose not to return.

On appeal in No. 75–2268 *et al.*, was the District Court's grant of partial summary judgment for the tenants. Subsequent to that order, the court, with the consent of all the parties, remanded the question of the disposition of Sky Tower to HUD for reconsideration in light of the concerns expressed in the trial court's opinion granting the preliminary injunction.[2] On December 17, 1976, HUD reported to the court that it had decided not to demolish Sky Tower but rather to transfer it to the District of Columbia, with HUD continuing to contribute substantial rent subsidies. HUD and the National Capital Housing Authority of the District of Columbia filed with the court their 7-page "agreement for acquisition" of the project. The agreement was in general satisfactory to the tenants, but it left open several issues of major importance, including the amount of the purchase price, the amount of operating expenses, and the nature and extent of repair and rehabilitation work to be preformed. The parties gave themselves approximately 220 days to resolve these issues, and to date the sale has not been consummated.

After the proposed disposition was filed, the parties undertook to negotiate a dismissal of the suit as moot, but they were unable to agree because the tenants felt several minor issues remained. The trial judge then took the matter under advise-

---

1. 42 U.S.C. § 4601 *et seq.* (1970) (hereinafter referred to as the Uniform Relocation Act).

2. *Cole v. Lynn*, 389 F.Supp. 99 (D.D.C.1975).

ment and, on January 31, 1976, dismissed the complaint.[3] The tenants brought this appeal.

■ The tenants' first charge is that the dismissal was improper because the transfer of Sky Tower is still not a reality; the court should have retained jurisdiction until that transfer had been effected. We agree that the disposition of Sky Tower is not yet an absolute certainty. But the trial judge concluded that the agreement to transfer ownership to the District of Columbia adequately assured that Sky Tower would not be demolished, and we cannot say his conclusion was error. We assume that if for any reason the agreement collapses and HUD decides anew to demolish the project, that decision will be subject to review.[4]

The tenants further argue that three issues remained for decision when the complaint was dismissed. All three involve the right of particular persons to apartments at Sky Tower. First there is the claim of two families, the Greenes and the Huggins, who left Sky Tower prior to the decision to demolish and prior to the notices of eviction. They argued that they were driven out by intolerable conditions at Sky Tower due to HUD's neglect of the buildings in the year prior to the decision to demolish. As one tenant states in her affidavit.

I feel that I was just as much forced to move by the conditions at Sky Tower as the tenants who moved after they got the notice to move, because I lived there during the same time, and it was because of the bad conditions and then the overcrowding that we had to move when we did.[5]

■ We do not doubt that these tenants are sincere and that the deterioration of Sky Tower which they so graphically depict[6] necessitated their departure. Never-

3. Since the judge weighed the parties' oral arguments and the tenants' memorandum and affidavits as well as the complaint, his disposition of the case should more properly be termed summary judgment. *See Mazaleski v. Treusdell*, 183 U.S.App.D.C. 182 at 189–190, 562 F.2d 701 at 708–709 (1977).

4. The dismissal order began with the following premise: "Further demolition will not take place. The property has been sold to the District of Columbia and with financial aid from HUD will continue as a viable property to house large low-income families." Order of January 31, 1977.

5. Affidavit of Gwendolyn Huggins, January 26, 1977.

6. For example, the affidavit of Collis Greene, January 25, 1977, states:

I lived at Sky Tower for three years. I was pleased with the conditions there at first. In the summer of 1973, after HUD took over, the conditions got much worse. The management failed to respond adequately to my requests for repairs. There were rats everywhere; in the basement there was standing water where the rats settled. I found rats throughout my apartment: in my bread, on top of my dining room table and on the refrigerator. I would wake up in the middle of the night, and the rats would be all over my apartment. I tried everything to get rid of them, but they kept returning. Outside, there were even more problems. If you opened the apartment door to go out, the rats would come in, going the other way. I some-

times had to throw rocks or stones at the rats in the front in order to clear my way into the building. The children in the project would kill the rats, and I would find my small daughter, who didn't know better, playing with the dead animals. I was finally forced to keep my children inside, although inside wasn't much better.

I also had problems with the heat. It was constantly cold. One time my ceiling in the living area was sagging, and I was forced to use a thick four-by-four piece of wood to prop up the ceiling for a whole week before it was repaired.

The service provided was terrible; not even ordinary maintenance was being done. Often they would promise to repair something and would not come. I had to hire babysitters for the children and sometimes even stay home from work to wait for repairmen. The conditions got so bad that I asked repeatedly to be moved out of 1070, but they refused to move me. When I complained about the smell of the dead rodents, they would only sprinkle powder in the area and refuse to look behind the baseboard. Needless to say, the smell continued.

My daughter became very ill in July 1973. She was hospitalized for five to seven days with viral meningitis. The doctors attributed the viral meningitis to the living conditions and advised me to move. I took their report to the manager's office and again asked, for medical reasons, to be moved to a rehabilitated apartment. They refused. I wouldn't have left Sky Tower if they had put me in an apartment that was safe and warm for my children.

theless it is clear from a reading of the complaint that their claims are wholly outside the scope of this litigation. This suit challenged only the decision to demolish Sky Tower and the evictions which followed therefrom.

■ The second claim which the trial judge dismissed was that of two families, the Strongs and the Proctors, who seek additional space at Sky Tower. In the Strongs' three bedroom apartment resides six adults and three children. The Proctors have four bedrooms for six adults and two children. Their requests for an additional or a larger apartment have been denied by Sky Tower management. Therefore they sought relief from the court, framing their claim as follows: "For the Proctors and the Strongs, this suit asks if HUD fulfills its obligations to its tenants by crowding six adults and three children in a three-bedroom apartment."[7] Again, while we agree that these tenants are egregiously overcrowded, their claims are completely outside the scope of this litigation.[8] The suit simply did not put in issue every aspect of life at Sky Tower. The trial court was correct in concluding, "It is not the responsibility of the Court to deal with these matters."[9]

■ The tenants' third remaining claim is that the 37 families who chose not to return to Sky Tower when given that opportunity in the summer of 1975 are entitled to a renewed opportunity to return there, now that its continued existence is assured. Unlike the others, this claim is within the parameters of the complaint, which asked, among other things, "that the Court order defendants to locate such tenants and advise them of their right to such [relocation] benefits as well as their right to return to Sky Tower Apartments upon completed rehabilitation."[10] In dismissing this claim, the trial judge ruled that the preliminary injunction did not require the reoffering of occupancy to tenants who declined to return in the summer of 1975. Because our decision in No. 75–2268 *et al.*, bears on the legal basis for that ruling, we remand the case to the District Court for reconsideration of this claim in light of that opinion.

We held in No. 75–2268 *et al.*, that the offer to return to Sky Tower in the summer of 1975 did not terminate the 37 families' right to receive relocation benefits. As we noted there, that offer was considerably less than an offer to return to the quiet enjoyment of their homes. It was an opportunity to return to half-demolished buildings surrounded by rubble, at the price of relinquishing new quarters found only after a search which "took time from jobs, money from budgets already strained, and a degree of physical and emotional energy that it is hard for those of us who have never faced similar deadlines with similar incapacities to imagine fully."[11] And all for an unknown and extremely uncertain tenure in Sky Tower.

■ Since our holding in No. 75–2268 *et al.*, gives the 37 families a continuing right to receive relocation assistance in their new homes, it may be that they will choose not to press their claim to return to Sky Tower. In the event that they do, the trial judge should reconsider the claim in light of our decision in No. 75–2268 *et al.* After receiving whatever submissions the parties may now care to make, he should consider, among other things, (1) whether the 37 families have found suitable replacement housing as required by the Uniform Relocation Act,[12] and (2) whether equitable considerations require that households, once

---

7. Motion for Summary Reversal at 8.

8. We intimate no view as to HUD's "obligation" to provide uncrowded housing for low-income tenants.

9. Order of January 31, 1977.

10. Complaint at 17.

11. Tenants' memorandum of January 27, 1977, at 2.

12. 42 U.S.C. §§ 4626(b) and 4625(c)(3) (1970).

wrongfully evicted, now be restored to the positions they would have occupied had the improper administrative action not occurred.[13]

Accordingly, the District Court's order as to the entitlement of these 37 families is vacated and the case remanded for further consideration in light of our opinion in No. 75–2268 *et al.* The remainder of the judgment is affirmed.

*So ordered.*

WILKEY, Circuit Judge, concurring in the result.

I dissented in *Cole v. Harris*, Nos. 75–2268 and 75–2269, 187 U.S.App.D.C. ——, 571 F.2d 599, because I believed that the plaintiffs there (including the 37 families here) were not "displaced persons" within the meaning of the Uniform Relocation Act. However, I agree that if those plaintiffs were "displaced persons" under the Act, they would be entitled to its benefits in full, notwithstanding their decision not to return to Sky Tower in the summer of 1975. Accordingly, I agree that No. 77–1360 should be remanded to the district court for reconsideration in light of Part III of Chief Judge Bazelon's opinion in Nos. 75–2268 and 75–2269, 187 U.S.App.D.C. ——, 571 F.2d 590.

13. HUD points out that the agreement between HUD and the National Capital Housing Authority prohibits HUD from relocating any additional tenants into Sky Tower without NCHA's approval. Agreement for acquisition of Sky Tower apartments, December 17, 1976, ¶ 3(e). This is an untenable argument. HUD is a defendant in this lawsuit and it cannot avoid its legal obligations by entering into a contract.