**Deborah LEE, et al., Plaintiffs,**

v.

**Samuel R. PIERCE, Jr., Secretary of Housing and Urban Development, Defendant.**

**Civ. A. No. 88–2395–OG.**

United States District Court, District of Columbia.

Sept. 22, 1988.

William Bradford, Emily Moskowitz, Hogan & Hartson, Washington, D.C., for plaintiffs.

Robert Irvin, U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM

GASCH, Senior District Judge.

In this matter plaintiffs seek to enjoin the Department of Housing and Urban Development (HUD) from selling or disposing of houses in its single-family inventory other than for the benefit of the homeless. Plaintiffs argue that HUD's program of selling houses out of its single-family inventory violates the Stewart B. McKinney Homeless Assistance Act (the McKinney Act), the National Housing Act, and several other federal statutes. Plaintiffs are four individual homeless persons currently residing in shelters, and numerous organizations made up of or representing homeless persons. The defendant, Samuel R. Pierce, Jr., is Secretary of HUD.

On August 26, 1988, Judge Thomas F. Hogan, acting as motions judge pursuant

to Local Rule 408, entered a temporary restraining order (TRO) prohibiting HUD from selling single-family properties from its inventory in the state of Michigan. Plaintiffs amended their complaint and filed a motion for a nationwide TRO on August 29. On August 30, Judge Harold H. Greene, acting as motions judge, entered a TRO enjoining HUD from selling any homes in the single-family inventory other than for the benefit of homeless and low income persons. In response to the government's motion for clarification of the first TRO, Judge Greene ruled that HUD could close on those sales where the purchase contract was signed prior to the issuance of the first TRO.

The injunctive relief requested of this Court by the plaintiffs would prevent HUD from taking any steps to dispose of its single-family inventory except for the benefit of homeless or low income persons until it surveyed those homes in compliance with the McKinney Act, considered its statutory obligation to promote fair housing, and otherwise complied with the various federal statutes.

## I. *Factual background*

### A. The Homeless

Plaintiffs assert, without contradiction, that there are many more homeless persons in the United States than units of available housing. There are approximately three million homeless persons nationwide, including many families and children. The absence of affordable housing is reflected by the long waiting lists for subsidized housing programs: 800,000 households nationwide. In addition to the homeless, there are millions of low income or poverty-level Americans spending a disproportionate amount (over 30%) of their income on housing.

### B. The plaintiffs

There are both individual and organizational plaintiffs. The four individual plaintiffs are women who have children and reside in homeless shelters. Three of the four are members of minority groups. There are two types of organizational plain-

tiffs. Two organizations, Philadelphia Union of the Homeless and Community for Creative Non–Violence, are made up primarily of homeless persons. They represent their members' legal interests and provide shelter and medical care. Five plaintiffs are charitable organizations that aid homeless and low-income persons in ways that include acquiring and, if necessary, renovating, housing. The plaintiffs also claim to represent a class of persons and organizations similarly situated.

### C. HUD's program

HUD currently owns approximately 50,000 vacant single-family houses. Nearly all of these properties were acquired through HUD's mortgage insurance program. *See* 12 U.S.C. § 1709. Under this National Housing Act program, when a mortgagee forecloses on the federally insured property, it can make a claim for insurance benefits. *See* 24 C.F.R. § 203, subpart B. In most cases the mortgagee must deed title to HUD and deliver the property in vacant condition to receive its benefits. *See* 12 U.S.C. § 1710(a); 24 C.F.R. § 203.355–57. HUD then attempts to sell the property by a bidding process in which HUD advertises the property (usually within 14 days of acquisition) and receives sealed bids in the form of signed HUD sales contracts and earnest money deposits. The highest bid is accepted if the price is acceptable and certain contractual conditions are satisfied. The sale is ordinarily closed within 60 days of HUD's acceptance of the bid. Declaration of Stephen A. Martin, Director, Office of Insured Family Housing, HUD. HUD's sales program is not administered on a nationwide basis; its 73 field offices conduct their own programs.

The average selling price of homes from the single-family inventory is $38–50,000. *Compare* Declaration of Stephen Martin *with* Plaintiffs' Amended Complaint, Exhibit G, Letter from Michael Dorsey, HUD General Counsel. According to HUD, a family of four with no major credit liabilities would need an annual income of $15,000 to qualify for a typical home mortgage

of $38,000. HUD defines "low income" families as those whose annual income is $25,600 or less.

HUD estimates that 50% of the single-family houses are sold to investors who rent the properties or resell them for profit. Supplemental Declaration of Stephen A. Martin. Affidavits from leaders of various non-profit organizations ("housing providers") that have attempted to acquire these single-family houses estimate the figure to be much higher, especially in urban areas such as the District of Columbia where affordable housing is scarce. *See* Declaration of Rev. Thomas Knoll, Executive Director of Community Family Services. HUD cannot estimate what percent of the houses are sold to homeless or low income persons.

The sale proceeds are deposited into the four funds that make up the Federal Housing Administration (FHA) Insurance Fund. The FHA Insurance Fund uses these monies to pay insurance claims, maintenance and sales costs, salaries, and to fund future mortgage insurance transactions. There is a rapid turnover of the single-family homes acquired by HUD. In the first ten months of fiscal year 1988, HUD acquired approximately 7,128 properties per month and sold approximately 6,212 per month. HUD acquired 64,880 properties in fiscal year 1987 and sold 52,694 of them, resulting in a net intake of 2.2 billion dollars. HUD has three programs intended to assist the homeless. In its Reduced Sales Program, HUD offers a 10% discount to qualified homeless organizations. HUD has sold 164 single-family properties to homeless providers since 1985. Its Lease Program leases houses to homeless organizations at a cost of one dollar per year on a case-by-case basis. This program was recently changed to include the single-family inventory. Currently, 185 houses are leased under this program. HUD also has a Lease Option Program that permits homeless providers to lease houses for six months while applying for grants to purchase them. Plaintiffs allege that they have been "frustrated and rebuffed" when seeking to obtain housing under these programs, and that the HUD local field offices are either not aware of or not supporting the programs. *See* Declaration of Rodman McCoy, Director of Program Services of Neighborhood Housing Services; Declaration of Rev. Thomas Knoll. A phone survey conducted by plaintiffs of housing providers in 32 cities revealed that none were aware of these HUD programs. Declaration of Mary Ellen Hombs, Analyst for National Coalition for the Homeless. In their declarations in this case, several organizations specifically averred that when they sought to purchase single-family houses at some type of discount, HUD field offices told them HUD was forbidden from selling the houses under any circumstances other than sale to the highest bidder. *See* Declaration of Rev. Jim Dickerson, Director of MANNA; Declaration of Rodman McCoy. In one instance the Washington field office allegedly told area housing providers that it would accept bids for a block of properties on a preferential basis, the organizations submitted bids, and the field office rescinded the sale on orders from the national office. Declaration of Rev. Jim Dickerson.

## II. *Standing*

█  Defendant Pierce contends that the plaintiffs lack standing because their injuries are speculative, not fairly traceable to HUD's conduct, and not likely to be redressed by the relief they seek. The injury cited by the individual plaintiffs is being homeless. The organizational plaintiffs face a severe shortage of houses that they can make available for homeless and low-income families, and their members are homeless as a consequence. These claims of injury are sufficiently concrete. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982); *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 937–38 (D.C.Cir. 1986).

Plaintiffs have also satisfied the causation and redressability requirements for standing. They have convincingly demonstrated that their inability to find sufficient housing is caused, at least in part, by HUD's refusal to make houses available from its single-family inventory. Some of

the organizations have bid for HUD properties against other purchasers with little or no success. *See* Declaration of Rodman McCoy. Plaintiffs cite specific examples where houses purchased by investors at HUD auctions remained vacant after their sale and subsequently deteriorated. *See id.* In other cases, homes purchased by investors deteriorated beyond repair even when occupied. Declaration of Martha Scott, Mayor of Highland Park, Michigan. Plaintiffs also cite instances in which HUD refused to sell houses because its minimum price was not met, and the vacant houses subsequently fell into a state of disrepair. Declaration of Rodman McCoy; Declaration of Rev. Jim Dickerson. In short, plaintiffs' injuries are caused by HUD's refusal to make single-family properties available to assist the homeless. *See Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977).

Most of the organizational plaintiffs, and similar organizations they claim to represent, currently have programs in which they acquire single-family houses and make them available at little or no cost to homeless families or individuals. Declaration of LaVelle Williams, Chair of the Michigan Avenue Community Organization; Declaration of Edward Schwartz, Director of the Office of Housing and Community Development for Philadelphia; Declaration of Brian Carome, Executive Director of Housing Opportunities for Women; Declaration of Rosa Sims, Executive Director of United Street Networking and Planning; Declaration of Martha Scott. The plaintiffs are ready and able to use HUD's single-family homes to alleviate the homelessness of their members.

The defendant asserts that plaintiffs' prospects for redress are too attenuated because the relief requested will not compel HUD to provide any of its inventory to the plaintiffs. But the relief requested, HUD's compliance with the statutes, is the "necessary first step" for the plaintiffs to reap any benefit from the statutes. *Bruce v. Department of Defense*, No. 87–0425, mem. op. at 6 (D.D.C. June 17, 1987) [available on WESTLAW, 1987 WL 13140] (indi-

vidual and organizational homeless plaintiffs had standing to challenge DOD's failure to promulgate regulations under statute designed to assist the homeless); *see also Arlington Heights*, 429 U.S. at 261, 97 S.Ct. at 561; *Samaritan Health Center v. Heckler*, 636 F.Supp. 503, 512 (D.D.C.1985); *National Ass'n of Rehabilitation Facilities v. Schweiker*, 550 F.Supp. 357, 364 (D.D.C.1982). The defendant's standing argument must be rejected.

## III. *Discussion*

The criteria to be applied when considering a motion for preliminary injunction are:

1) plaintiffs' likelihood of success on the merits;

2) irreparable injury to the plaintiffs in the absence of injunctive relief;

3) possibility of harm to other interested parties from the injunctive relief and

4) the interests of the public.

*WMATC v. Holiday Tours*, 559 F.2d 841, 842–43 (D.C.Cir.1977); *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958). The Court will evaluate each of these factors in turn.

### A. Likelihood of Success on the Merits
#### 1. *The McKinney Act claim*

The Stewart B. McKinney Homeless Assistance Act, 42 U.S.C. § 11301 *et seq.*, enacted in 1987, was intended "to use public resources and programs in a more coordinated manner to meet the critically urgent needs of the homeless." *Id.* § 11301(b)(2). The Act consists of nine titles providing food, shelter, education, training, health services, and housing assistance to the homeless. Section 501 of the Act, codified at 42 U.S.C. §§ 11411–12, sets out a process by which underutilized federal property is to be made available to assist the homeless. First, the statute requires HUD to collect information about federal buildings and real properties "that are described in surveys by the heads of controlling agencies as underutilized." *Id.* § 11411(a). HUD is to identify which of these underutilized properties "are suitable

for use for facilities to assist the homeless." *Id.* HUD is instructed to consult with the Department of Health and Human Services (HHS) and the Administrator of General Services (GSA) when developing the criteria for the suitability determination. *Id.* HUD must then notify the respective agency heads as to which of their properties have been identified as suitable. *Id.* § 11411(b). Then, within thirty days, the agency heads must either declare the identified property as "excess" to their needs or explain why it is not excess. Finally, HHS and GSA are to make the properties identified by HUD available to the homeless by the use of leases at least one year in duration. *Id.* § 11411(c).

Section 501 also requires the GSA to make quarterly reports, beginning 90 days after enactment of the statute, on the implementation of the statute. The report is to include a list of the properties identified by HUD as suitable, a statement of the agency heads' responses, and a description of the actions taken by HHS and GSA to make the suitable properties available to the homeless. *Id.* § 11411(e).

█ HUD argues that its single-family inventory is not subject to the Act's procedure for making underutilized federal properties available to the homeless. HUD offers three reasons why it, unlike other federal agencies, is not required to survey its single-family inventory and describe its underutilized properties. First, it says that the discretion granted HUD by the National Housing Act, 12 U.S.C. § 1701 *et seq.*, trumps the requirements of the McKinney Act. The relevant section of the National Housing Act reads:

> Notwithstanding any other provision of law relating to the acquisition, handling, or disposal of real property by the United States, the Secretary [of HUD] shall have power to deal with, complete, rent, renovate, modernize, insure, or sell for cash or credit, in his discretion, any properties conveyed to him in exchange for [mortgage insurance claims]....

12 U.S.C. § 1710(g). The National Housing Act predates the McKinney Act, but there is nothing in the McKinney Act to suggest

that Congress intended to amend the National Housing Act.

Plaintiffs have two responses to this analysis. First, they to point a statement in two House committee reports on the 1988 reauthorization of the McKinney Act that makes clear that the House committees intend for the McKinney Act to apply to HUD's inventory:

> The Committee is also concerned that the Department make available foreclosed single-family properties in the HUD inventory for use under one year leases by homeless families.

H.Rep. No. 741, 100th Cong., 2d Sess. 33–34 (1988) (Report of Committee on Banking, Finance and Urban Affairs on the Omnibus McKinney Homeless Assistance Act of 1988); H.Rep. No. 718, 100th Cong., 2d Sess., pt. 2 at 40–41 (1988) (Committee on Energy and Commerce). However, the clarity with which the House committees express themselves on this issue must be tempered by the time and place in which the statements appear.

The Supreme Court has provided guidance about the amount of weight to be accorded congressional declarations of intent subsequent to the enactment of a statute. In *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 2061 n. 13, 64 L.Ed.2d 766 (1980), the Court explained "[a] mere statement in a conference report ... as to what the Committee believes an earlier statute meant is obviously less weighty" than subsequent legislation. On another occasion the Court gave subsequent statements significant weight. *See Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 596, 100 S.Ct. 800, 813, 63 L.Ed.2d 36 (1980) ("[W]hile the views of subsequent Congresses cannot override the unmistakable intent of the enacting one, such views are entitled to significant weight.") (citations omitted). These cases suggest that subsequent *legislation* is much more authoritative than a congressman's statement or a committee report. Yet in 1988 the House did not change the McKinney Act to require HUD to consider making houses from the single-family inventory available

to assist the homeless.[1] The significance of the House committees' statements is further diminished by the fact that the 1988 reauthorization has not yet passed the Senate. H.Rep. No. 741, *supra*, at 11.

■ Plaintiffs' second response to HUD's contention is more persuasive. They argue that HUD's discretion under the National Housing Act is not unfettered, and that the McKinney Act is merely a check on HUD's discretion.[2] Put another way, the McKinney Act does not prevent HUD from selling the houses, it merely requires HUD to consider whether some houses should be leased to the homeless for a year or more. For example, the Fair Housing Act prohibits the sale of housing based on racial and other discriminatory factors. 42 U.S.C. § 3604. At the hearing on this motion, HUD argued that it complied with the Fair Housing Act; thus, the Fair Housing Act (and others like it) limits or supersedes HUD's discretion under the National Housing Act, despite the National Housing Act's grant of discretion to HUD "[n]otwithstanding any other provision of law." HUD is unable to persuade the Court that the McKinney Act does not have the same limiting or superseding effect.

HUD's second reason for concluding that the McKinney Act does not apply is that 1) the McKinney Act only applies to surveyed properties, 2) HUD's single-family inventory is not presently surveyed, 3) the McKinney Act does not impose a new survey requirement, and consequently the Act does not apply to its single-family inventory. There is no doubt that the first step in the statutory process is for HUD to collect information about properties "described in surveys by the heads of controlling agencies as underutilized." 42 U.S.C. § 1411(a). Moreover, plaintiffs do not point to any surveys presently being conducted of HUD's single-family inventory.[3]

■ It is the third step of HUD's analysis that plaintiffs vigorously contest. The legislative history makes clear that in the McKinney Act Congress was referring to surveys already being "conducted pursuant to existing law." H.Conf.Rep. No. 174, 100th Cong., 1st Sess., p. 85 (1987) (Stewart B. McKinney Homeless Assistance Act) (noting that HUD is required to collect information "which controlling agency heads have identified in surveys pursuant to existing requirements of law as underutilized"). The absence of any appropria-

---

**1.** The only amendment by the House to section 501(a) in 1988 requires that HUD take no longer than two months after receiving the list of underutilized properties from the respective agencies to identify which underutilized properties are suitable for the homeless.

**2.** Plaintiffs also argue that the National Housing Act is a general statute which is modified by a more specific statute, the McKinney Act. *See* 2A Sutherland Statutory Construction § 51.05 (1984); *Washington Water Power Co. v. FERC,* 775 F.2d 305, 323 (D.C.Cir.1985) ("a special act prevails in effect over more general acts"). The argument is not that the later-enacted statute controls; a special act "will prevail regardless of whether it was passed prior to the general statute." 2A Sutherland Statutory Construction § 51.05. HUD's response is that the National Housing Act is the more specific of the two statutes. The Court is inclined to agree. The subject matter which both statutes address is the disposition of houses in the HUD inventory. The National Housing Act is far more detailed on this subject than the McKinney Act. Indeed, the McKinney Act applies to all federal buildings and real properties. Thus, the distinction the plaintiffs raise between general and special

statutes does not further their argument that the McKinney Act modifies the National Housing Act. The principle suggests the opposite conclusion.

**3.** The Conference Report specifically mentions, as an example of an existing law requiring surveys, section 202(b) of the Federal Property and Administrative Services Act of 1949 (FPASA). *See* 40 U.S.C. § 483. The GSA is responsible for administering the survey requirements of section 202(b) of FPASA, and does not require HUD to survey its single-family inventory under this provision because section 602(d)(11) of FPASA, 40 U.S.C. § 474(11), provides that HUD's authority to dispose of residential property is not affected by FPASA.

Plaintiffs correctly note that the reference in the legislative history to surveys conducted under FPASA is merely an example; it does not purport to list every property survey that agencies might undertake. But plaintiffs are unable to point to any surveys of HUD's single-family inventory, although one HUD document does refer to an "inventory" made by HUD's Office of Property Disposition. *See* Plaintiffs' Proposed Findings of Fact, Exhibit E, Memo from Lawrence Goldberger.

tions to conduct surveys is further evidence that Congress intended that only preexisting surveys be used. Plaintiffs point to the legislative history of the 1988 reauthorization, which indicates that HUD's single-family inventory was meant to be included, as evidence that the statute is not limited to only those properties currently being surveyed. They also contend that HUD itself interpreted the statute to require agencies to undertake a survey of their properties for the sole purpose of identifying underutilized properties. In a letter to federal agencies explaining what the McKinney Act entailed for HUD and the various agencies, Secretary Pierce wrote, "in order to speed the process of identifying these properties, I am requesting you to review the listing of properties held by your agency to identify those which are underutilized." Plaintiffs' Reply Brief, Exhibit C. If Pierce's reference to "review" meant "survey," then the plaintiffs have a sound argument; HUD was asking agencies to undertake an additional survey of their properties. But "review" could also mean "review your existing surveys." Plaintiffs also cite other examples in which HUD acted as if its single-family inventory were subject to the McKinney Act. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law Exhibit C, Status of Agency Responses to McKinney Act (HUD indicating that "forclosure [sic] candidates under consideration"); *id.* Exhibit E, Memo from L. Goldberger, (indicating that HUD's "surplus" properties include "single family homes inventoried by the Office of Property Disposition"). But even if the plaintiffs could show that HUD initially thought it was bound by the McKinney Act, HUD's interpretation must be balanced by the clear statement in the legislative history, which plaintiffs never squarely address, that the surveys referred to in section 501(a) are those "required under existing law." H.Conf.Rep. 174, *supra,* at 85. In the face of this plain congressional intent, the Court must inevitably conclude that the McKinney Act does not require HUD to initiate surveys of its single-family inventory.

HUD's third and final argument for exemption from the McKinney Act is that the vacant single-family houses do not meet the definition of "underutilized." The McKinney Act does not define "underutilized." HUD argues that the definition contained in GSA regulations under the Federal Property and Administrative Services Act (FPASA) is properly used in light of the reference to FPASA in the McKinney Act's legislative history. *See supra* note 3.

The GSA regulations define underutilized properties as those used "only at irregular periods or intermittently" or those for which "only a portion" of the property is needed by the agency. 41 C.F.R. §§ 101–47.802(a)(1), (b). HUD argues that vacant homes do not fall within this definition. But surely Congress did not intend for vacant properties, such as vacant hospitals, to be excluded from the Act. In fact, HUD has adopted a more reasonable interpretation of the term that flatly contradicts this argument. In his letter to agency heads about the McKinney Act, defendant Pierce wrote that "as used in the statute, the term underutilized refers to entire properties or portions of properties which could be made available for lease." Plaintiffs' Reply Brief, Exhibit C. That same letter provided that "suitable" properties included "Vacant land." *Id.* Moreover, nearly all of the twelve properties HUD has identified thus far as suitable to assist the homeless were vacant. Thus, HUD's argument that vacant houses are not "underutilized" properties contradicts both common sense and its own pronouncements on the subject.

In conclusion, to successfully prosecute their McKinney Act claim, plaintiffs must demonstrate that the discretion given HUD in the National Housing Act is limited by the McKinney Act, and that the McKinney Act is not limited to only those federal properties that are presently subject to a survey requirement. There is good reason to believe that the McKinney Act does limit HUD's discretion under the National Housing Act. But plaintiffs have not shown that the McKinney Act was intended to apply to HUD's single-family in-

ventory, since that inventory is not presently subject to a survey requirement. The Court concludes that the plaintiffs have not shown the requisite likelihood of success on the merits of their McKinney Act claim.

### 2. *National Housing Act Claim*

■ Plaintiffs' second statutory claim is that HUD is violating the National Housing Act. The crux of this argument is that HUD's sale program fails to consider the statutory "goal of a decent home and a suitable living environment for every American Family." 42 U.S.C. § 1441. It is well established that this statutory language "is not precatory. HUD is obliged to follow these policies. Action taken without consideration of them, or in conflict with them, will not stand." *Commonwealth of Pennsylvania v. Lynn,* 501 F.2d 848, 855 (D.C.Cir.1974). Courts have consistently invalidated HUD actions that did not consider this statutory goal. In *Cole v. Lynn,* 389 F.Supp. 99 (D.D.C.1975), Judge Gesell held that HUD could not demolish a housing project because it had not considered whether alternatives might better serve the goals of the National Housing Act.

> "Congress did not intend HUD to be a commercial lending agency.... The Secretary cannot avoid giving full consideration to all available options to effectuate national housing policy."

*Id.* at 103. HUD's policy was to "dispose of all acquired multifamily properties at the earliest possible date at the highest price obtainable in the current market." *Id.* at 102 (citing HUD Property Disposition Handbook for Multifamily Properties, HM 4315.1 (Feb. 17, 1971)). Similarly, HUD's policy in the instant case is to dispose of its single-family houses quickly and maximize its dollar return. *See* Declaration of Stephen Martin. Plaintiffs argue that HUD's policy with respect to its single-family properties, like its policy with respect to the multi-family properties in *Cole v. Lynn,* violates the statute because HUD does not consider any alternatives. *See Cole v. Lynn,* 389 F.Supp. at 103 ("It is not for the Court to weight the merits of the statutory alternatives available ... but it

can require that [HUD] ... consider these alternatives."). In the wake of *Cole,* HUD adopted regulations incorporating Fair Housing Act obligations. *See* 24 C.F.R. § 290.2. Plaintiffs claim that such procedures are also necessary in the single-family property disposition context.

In more recent cases, courts have relied on obligations in the Fair Housing Act to prevent HUD from selling a low income housing project to a private purchaser, *Russell v. Landrieu,* 621 F.2d 1037 (9th Cir.1980) (Kennedy, J.), and to enjoin HUD from selling mortgages on several multifamily housing projects, *Walker v. Pierce,* 665 F.Supp. 831 (N.D.Cal.1987). In *Walker* the court noted that HUD has "statutory authority to sell mortgages under 12 U.S.C. § 1713(k)." *Id.* at 837. The court held:

> HUD abused [its] discretion in deciding to proceed with the mortgage sales at issue here. The Secretary acted in conformity with ... policies that are totally unrelated to the objectives of the National Housing Act, such as the maximization of financial return to the federal government.

*Walker,* 665 F.Supp. at 841. Clearly, HUD cannot base its decisions solely on what will create the most revenue for the government. *See United States v. Winthrop Towers,* 628 F.2d 1028 (7th Cir.1980); *Kent Farm Co. v. Hills,* 417 F.Supp. 297 (D.D.C.1976).

HUD responds that it does comply with the mandate of the National Housing Act. HUD argues that this case is different from the above line of cases because rather than resulting in the loss of housing opportunities, HUD's action causes the reentry of inexpensive single-family homes into the nation's housing market. But *Walker* and *Russell* are not so easily distinguished; in those cases, HUD was not removing houses from the market as in *Cole.* HUD also contends that it does not sell every property to the highest bidder, pointing to its three programs discussed earlier, *supra* at 336. But the scope and impact of those programs is, by HUD's own statistics, minimal. Of the approximately 190,000 houses acquired since 1985, approximately 362

have been sold or leased to homeless providers. *See* Declaration of Stephen Martin. Plaintiffs also dispute HUD's assertion that low and moderate income buyers ordinarily can purchase these houses. Plaintiffs argue that HUD's requirement that sales close within 60 days prevents low and moderate income purchasers from acquiring financing. Plaintiffs also note that the requirement of an earnest money deposit, $2,000 at HUD's Washington, D.C. sale, makes it impractical for low income Americans to take part in the sales. In sum, plaintiffs' National Housing Act claim turns on the factual question of whether HUD has taken the Act's imperatives into consideration. The Court concludes that although the plaintiffs have not demonstrated the requisite probability of success on the merits of their National Housing Act claim, they have raised a serious legal question.

### 3. *Fair Housing Act claim*

■ The Fair Housing Act, 42 U.S.C. §§ 3604–3606, prohibits discrimination in the sale or rental of housing. The Act requires HUD to "administer the programs and activities relative to housing and urban development in a manner affirmatively to further the policies of" fair housing. 42 U.S.C. § 3608(d). Plaintiffs claim that HUD must consider the fair housing implications of its acts, and that selling the single-family inventory without regard to the racial and socio-economic character of the purchasers violates this requirement. Title VIII of the Fair Housing Act did not create a private right of action. *NAACP v. HUD*, 817 F.2d 149, 152 (1st Cir.1987). Thus, HUD's action is reviewable by this Court under the Administrative Procedures Act (APA), 5 U.S.C. § 706. *Id.* at 157–59.

Plaintiffs have failed to demonstrate that HUD's failure to collect information about the nature of purchasers of single-family houses rises to an abuse of discretion under the APA. The Fair Housing Act does not require HUD to provide housing, but to eliminate discrimination in the sale or rental of housing. *Id.* at 154–55 (citing legislative history). HUD's assertion that it sells properties without regard to the race of the

purchaser is uncontroverted. Although HUD is obliged to "do more than simply refrain from discriminating," *id.* at 155, plaintiffs have not adduced any evidence that HUD's policy of selling its single-family inventory has segregative or discriminatory effects. Plaintiffs have not demonstrated the necessary likelihood of success on the merits of their Fair Housing Act claim.

### 4. *National Environmental Policy Act claim*

■ Plaintiffs argue that HUD's sales violate the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* NEPA requires agencies to compile environmental impact statements for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). HUD argues convincingly that an environmental impact statement is required only when the physical environment is affected. *See Metropolitan Edison v. People Against Nuclear Energy*, 460 U.S. 766, 772–74, 103 S.Ct. 1556, 1560–61, 75 L.Ed.2d 534 (1983); *Glass Packaging Inst. v. Regan*, 737 F.2d 1083 (D.C. Cir.), *cert. denied*, 469 U.S. 1035, 105 S.Ct. 509, 83 L.Ed.2d 400 (1984). Plaintiffs, however, contend that the physical environment is affected because of the presence of lead-based paint in some houses. HUD's regulations require lead-based paints to be removed when practical. *See* 24 C.F.R. § 200.815, as amended, 53 Fed.Reg. 20,-790–99. In any event, the Court fails to see how the plaintiffs have standing to raise this claim since their affidavits in this case amply demonstrate that they are unable to occupy these houses.

### 5. *Administrative Procedure Act claim*

■ Plaintiffs claim that HUD's policy of selling properties to the highest bidder not only violates the McKinney Act, the National Housing Act, and the Fair Housing Act, but is also arbitrary and capricious in violation of the APA. *See* 5 U.S.C. § 706(2)(A). These claims are predicated on those various statutes, and the Court need not add to its earlier analysis of those statutory claims. However, plaintiffs as-

sert one additional basis for their APA claim. They argue that HUD has failed to comply with the notice-and-comment rulemaking procedures of the APA, 5 U.S.C. § 553, and HUD's own rulemaking regulations, 24 C.F.R. § 10.1–.20. The APA provides that rulemaking procedures must be followed when rules are promulgated other than "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553. The APA defines rules as:

the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency....

5 U.S.C. § 551(4). The Court is not persuaded that HUD's policy of selling its single-family inventory meets the definition of a rule. In the plaintiffs' oft-cited case, *Walker v. Pierce*, 665 F.Supp. 831 (N.D. Cal.1987), the court found that HUD's decision to sell mortgages qualified as a rule. In making that determination the court noted that HUD's action "creates law by establishing the terms and conditions of the mortgage sales, and changing the terms and conditions under which the housing projects will operate in the future." *Id.* at 842. In contrast, HUD's present policy with respect to the sale of single-family houses is longstanding and unchanged. Therefore, notice-and-comment rulemaking is not required. *See* K. Davis, *Administrative Law*, § 1:4 (1978).

### B. Irreparable Harm to Plaintiffs

■ The crux of the plaintiffs' irreparable injury argument is that every house HUD sells is one that is irretrievably lost to the plaintiffs. HUD replies that the single-family inventory turns over rapidly; thus, the houses currently making up the inventory will soon be replaced with others that are substantially the same. The defendant argues that the approximately seven thousand houses that flow through the HUD inventory each month are far more than the plaintiffs could realistically expect to provide to the homeless. Plaintiffs' re-

joinder is that all of these houses will not be designated as suitable, so the large number of homes is meaningless. Plaintiffs are concerned that in the absence of an injunction, the relatively few houses now in the inventory that are suitable will be sold, and thereafter the plaintiffs' demands will far outstrip the supply of suitable houses. Plaintiffs also reject HUD's claim that HUD's inventory exceeds the demands of the homeless. They note that there are far more homeless and low income families and individuals than houses in HUD's inventory.

The Court finds that plaintiffs will not be irreparably injured in the absence of injunctive relief. HUD's inventory is continually replenished; next month's houses will be provide an ample supply and be just as suitable as those presently in the inventory.

### C. Harm to Others and the Public Interest

■ The other parties affected by this action are, of course, HUD and the potential purchasers of the 50,000 houses making up the HUD inventory. HUD argues that continuance of the injunction would impair its mortgage insurance program. Plaintiffs note that HUD has a large reserve in the Mutual Mortgage Insurance Fund, $5.9 billion in liquid assets. In August of this year HUD's general counsel wrote that even if HUD made no sales until the end of fiscal year 1989 (September of 1990), the cash balance in the fund would be $1.5 billion at that time. Plaintiffs' Amended Complaint, Exhibit G, Letter from Michael Dorsey. Thus, HUD's loss of income would be an inconvenience, not a bar to continuing the mortgage insurance program. But the Court takes note that although many of these houses are sold to investors, maintaining the injunction nonetheless would prevent thousands of Americans from purchasing relatively inexpensive homes. The public interests identified in the McKinney Act and the National Housing Act are better served by having the houses in HUD's single-family inventory occupied rather than vacant. In light of the absence of irreparable injury, the public

interest is best served by making these homes available to purchasers while plaintiffs adjudicate their claims.

## IV. *Conclusion*

Plaintiffs have failed to demonstrate the requisite likelihood of success on the merits of their claims and have not shown that they will suffer irreparable injury in the absence of injunctive relief. Moreover, the Court finds that the issuance of an injunction may harm other interested parties and would not serve the public interest. Therefore, it would be improper for the Court to issue the requested injunction.